**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFIT FUNDS, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) ) ) **CASE NO. 08-CV-9528 (SAS)** |
| Plaintiff, | ) ) ) |
| vs. | ) ) **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| SADIA S.A., LUIZ FERNANDO FURLAN, GILBERTO TOMAZONI, ADRIANO LIMA FERREIRA, WELSON TEIXEIRA, JR., WALTER FONTANA FILHO and EDUARDO FONTANA D'AVILA, | ) ) ) ) ) ) |
| Defendants. | ) ) ) **JURY TRIAL DEMANDED** |

Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Plaintiff") alleges upon personal knowledge as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, and upon information and belief and in reliance on the investigation of counsel as to all other matters, as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This is a federal securities class action brought on behalf of all purchasers of the American Depository Receipts ("ADRs") of Sadia S.A. ("Sadia" or the "Company") who purchased the Company's ADRs and common stock between April 30, 2008 and September 26, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Sadia is a major Brazilian food and beverages company whose principal activities include production, distribution, exporting and marketing of refrigerated and frozen food

products.   The Company sells its products through retail shops and food service chains throughout Latin America, the Middle East, Asia and Europe.

3.      During the Class Period, Sadia entered into undisclosed currency derivative contracts to purportedly hedge against the Company's U.S. dollar exposure.  The Company characterized the amounts of these contracts as "nominal."  However, these contracts violated Company policy in that they were far larger than necessary.  In fact, the contracts covered export-forward exposure for twelve months' worth of sales when the Company's internal hedge policy called for only six months' worth of coverage.  Simply put, the currency derivative contracts were pure speculation on the part of Sadia – a high-stakes gamble that went undisclosed to the Company's shareholders.

4.      As the U.S. dollar strengthened against the Brazilian Real, the value of Sadia's currency derivative contracts dwindled, resulting in a mark-to-market loss for the Company of over U.S. $365 million.  As a result of Sadia's clandestine currency wager, credit rating agencies downgraded Sadia, the Company fired its Chief Financial Officer, the Chairman and Vice Chairman resigned from the Company, and Sadia's stock suffered a severe decline, plummeting to the lowest levels in 14 years.  The Company has also had to postpone several projects in order to conserve cash to cover the shortfall.

5.      The Complaint alleges that, throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects.  Specifically, Defendants failed to disclose or indicate (1) that Sadia entered into currency derivative contracts to hedge against U.S. dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's hedge policy; (3) that the Company's financial statements were materially false and misleading in that they failed to account for the Company's

massive exposure to currency market fluctuations; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

6.     As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78(i)(b), 78(t) and 78t-1(a) and pendent common law claims.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     The Court has personal jurisdiction over this action because Sadia does business in this District and its stock trades as American Depository Shares (as evidenced by American Depository Receipts) on the New York Stock Exchange ("NYSE") under the symbol "SDA."

10.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds, as set forth in the accompanying certification and incorporated by reference

herein, purchased the publicly traded securities of Sadia in the form of American Depository Receipts at artificially inflated prices during the Class Period and has been damaged thereby.

12.     Defendant Sadia is a Brazilian corporation and maintains its principal executive offices at Rua Senador Attilio Fontana 86, Concordia, SC 89700-000, Brazil.  Sadia is a food and beverage corporation that sells its products in retail shops and food service chains throughout Latin America, the Middle East and Asia.  The Company's American Depository Shares traded on the NYSE under the symbol "SDA" at all relevant times during the Class Period.  In addition, Sadia's common stock trades on the Brazilian Sao Paulo Stock Exchange ("Bovespa") under the symbol "SDIA4 BZ" and on the Spanish Market for Latin-American Stocks in Euros ("LATIBEX") under the symbol "XSDI SM."

13.     Defendant Luiz Fernando Furlan ("Furlan") has served as the Chairman of the Board of the Company since October 6, 2008. He previously served as Chairman from August 1993 through 2002.

14.     Defendant Gilberto Tomazoni ("Tomazoni") has served as the Company's Chief Executive Officer and as a member of the Disclosure Policy Committee since April 2005.

15.     Defendant Welson Teixeira, Jr. ("Teixeira") serves as the Company's Chief Financial Officer, a position he has held since September 26, 2008.  Teixeira previously served as the Company's Director of Administration and Information Technology, Investor Relations Director, Interim Financial Officer, Controller and a member of the Disclosure Policy Committee.

16.     Defendant Adriano Lima Ferreira ("Ferreira") served as the Company's Chief Financial Officer during the Class Period.  Ferreira was terminated from the Company on September 26, 2008.

17.     Defendant Walter Fontana Filho ("Filho") served as the Company's President and Chairman during the Class Period.  Filho resigned from the Company on October 6, 2008.

18.     Defendant Eduardo Fontana d'Avila ("d'Avila") served as the Company's Vice Chairman during the Class Period.  D'Avila resigned from the Company on October 6, 2008.

19.     Defendants Furlan, Tomazoni, Teixeira, Ferreira, Filho and d'Avila are collectively referred to herein as the "Individual Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Sadia, were privy to confidential, proprietary and material adverse non-public information concerning Sadia, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Sadia's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and

presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose ADRs were, and are, registered with the Securities Exchange Commission ("SEC") pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Sadia's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Sadia's securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sadia's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Sadia, a refrigerated and frozen protein products company, offers processed products, poultry, and pork in Brazil.  The Company operates as a slaughterer and distributor of

poultry and pork products, domestic exporter of poultry, and domestic distributor of frozen and refrigerated meat-based products.  Sadia also specializes in the production of ready-to-eat sandwiches, lasagnas, pizzas, breads, rolls, cheese breads, and other pastry items.  The Company distributes its products through distribution and sales centers located in Brazil, Latin America, the Middle East, Asia, and Europe.  It is Brazil's main exporter of meat-based products.  Sadia was founded in 1944 and is headquartered in Sao Paulo, Brazil.

26.     In the Company's Form 6-K filed with the SEC on May 1, 2008, Sadia provided the following description of the market risks that could affect the Company, including currency variations, and its exposure to such risks:

> The Company's operations that are exposed to market risks, mainly with respect to foreign currency variations, credit risks and variations in the prices of agricultural commodities - corn, soy bean and derivatives. ***These risks are managed by the Risk Management area, through identification of exposures and correlations between the different risk factors, using the specific calculation method, VAR - Value at Risk and simulations of scenarios, and are permanently monitored by the Financial Committee and by the Commodities and Risk Management Committee***, consisting of members of the Board of Directors, who are responsible for defining management's strategy for administering these risks, determining the limits for positions, exposure and authority for decision making.
>
> * * *
>
> a.  Exchange Rate Risk
>
> The exchange rate risk for loans, financing and any other payables denominated in foreign currency is hedged by short-term investments denominated in foreign currency, with same interest rates, and by derivative financial instruments, such as rate swaps (dollar to CDI), interest rate swap contracts (Libor to pre-fixed or vice-versa) and future market agreements, in addition to foreign receivables from exports, which also reduce exchange variations by serving as a "natural hedge".

27.     Despite these assurances that the Company's exposure to market risks is effectively managed by the Financial and Commodities and Risk Management Committees, the Company entered into purely speculative currency derivative contracts as a purported "hedge"

against the U.S. dollar, violating Company policy in so doing.  In order to conceal the extent of the contracts, Defendants issued and disseminated false and misleading financial statements and omissions during the Class Period, as alleged in greater detail herein.

### False and Misleading Statements

28.     The Class Period begins on April 30, 2008 when Sadia filed with the SEC its Form 6-K reporting interim financial information for the three-month period ended March 31, 2008 ("First Quarter 2008 Form 6-K").  Defendant Teixeira signed the First Quarter 2008 Form 6-K.  With regard to the Company's use of currency contracts as its hedge strategy and the amount of assets exposed to exchange rate variations, the First Quarter 2008 Form 6-K provided the following:

> *At March 31, 2008, the VAR-Value at Risk for the operational assets and liabilities and financial instruments exposed to exchange rate variations for one year with 95% confidence, amounted to R$187,711, representing 6.10% of shareholders' equity.*
>
> * * *
>
> *The Company, within its hedge strategy, uses currency futures contracts (US dollars, Euros and Pounds), as a form of mitigating exchange rate risk over operating and financial assets and liabilities. The nominal amounts of these contracts are not recorded in the interim financial information.*

29.     The Company's Value at Risk estimate of approximately R$187 million as of March 31, 2008 equated to approximately U.S. $106 million, using the then-prevailing exchange rate of 1 Real to $0.57 U.S. dollars.

30.     The press release issued on this date reinforced the notion that Sadia's financial position was strong and that foreign exchange variations were managed in a conservative manner:

> The financial result in the quarter was positive by R$ 36.8 million, while it was negative by R$ 6.4 million in 2007.  Sadia financial result reflects the

management of its financial assets and liabilities and the foreign exchange variations of its investments abroad, oriented to preserve assets and liabilities on a consolidated basis.

31.     On July 31, 2008, the Company filed a Form 6-K with the SEC reporting financial results for the six-month period ended on June 30, 2008 ("First Half 2008 Form 6-K").  The First Half 2008 Form 6-K was signed by Defendant Teixeira and provided the following regarding the Company's conservative hedge strategy, the value at risk to currency fluctuations, the operations exposed to market risks and the "nominal" amount of the Company's currency contracts:

**Risk management and financial instruments**

The Company's operations that are exposed to market risks, mainly with respect to foreign currency variations, credit risks and variations in the prices of agricultural commodities - corn, soy bean and derivatives. ***These risks are managed by the Risk Management area, through identification of exposures and correlations between the different risk factors, using the specific calculation method, VAR - Value at Risk and simulations of scenarios, and are permanently monitored by the Financial Committee and by the Commodities and Risk Management Committee, consisting of members of the Board of Directors, who are responsible for defining management's strategy for administering these risks, determining the limits for positions, exposure and authority for decision making***. At June 30, 2008, ***the VAR-Value at Risk for the operational assets and liabilities and financial instruments exposed to exchange rate variations for one year with 95% confidence, amounted to R$241,710***, representing 7.68% of shareholders' equity (Information not reviewed).

*Exchange rate risk*

The exchange rate risk for loans, financing and any other payables denominated in foreign currency is hedged by short-term investments denominated in foreign currency, with same interest rates, and by derivative financial instruments, such as rate swaps (dollar to CDI), interest rate swap contracts (Libor to pre-fixed or vice-versa) and future market agreements, in addition to foreign receivables from exports, which also reduce exchange variations by serving as a "natural hedge".

The Company, within its hedge strategy, uses currency futures contracts (US dollars, Euros and Pounds), as a form of mitigating exchange rate risk over operating and financial assets and liabilities. ***The nominal amounts of these contracts are not recorded in the interim financial information***.

32.     The Company's Value at Risk estimate of approximately R$241 million as of June 30, 2008 equated to approximately U.S. $150 million, using the then-prevailing exchange rate of 1 Real to $0.62 U.S. dollars.

33.     The press release issued on this date reinforced the notion that Sadia's financial position was strong and that foreign exchange variations were managed in a conservative manner:

> Sadia's financial results reflect the financial management of its financial assets and liabilities as well as the foreign exchange variations of its investments abroad.
>
> For the half year, the result was a positive amount of R$24.6 million while in 2007 it was a negative R$3.8 million. This result is obtained basically from two factors. First the decrease in interest on financial investments was due to a reduction in the nominal amount invested. Second the foreign exchange effect caused by the variation of the currency on the exposure of the assets and liabilities as well as effects from hedges.

34.     Notably absent from Sadia's financial results during the Class Period was any mention of the Company's substantial exposure to currency fluctuations or the true extent of its investments in currency contracts hedging the U.S. dollar.  Indeed, the Company had represented to the investing public throughout the Class Period that such contracts were "nominal" in nature, thus not requiring them to be recorded in Sadia's interim financial information reports.

35.     The statements identified above were materially false and misleading because Defendants failed to disclose (1) that Sadia had entered into currency derivative contracts to hedge against U.S. dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's hedge policy in that the contracts covered export-forward exposure for twelve months' worth of sales when the policy called for only six months' worth of coverage; (3) that the Company's financial statements were materially false and misleading because they failed to account for the Company's massive exposure to currency market fluctuations; (4) that the

Company's exposure to currency contracts was massive and not "nominal" in nature, as Defendants claimed throughout the Class Period; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

### The Truth Comes To Light

36.     On September 25, 2008, after the markets closed, the Company stunned the investing public when it filed a Form 6-K with the SEC announcing that it would take a loss of approximately R$760 million (U.S. $410 million) related to the Company's investments in currency contracts hedging against the U.S. dollar.  The Form 6-K was signed by Defendant Teixeira and acknowledged that the nature and amounts of these currency contracts fell far outside "the purpose of protecting the activities of the Company exposed to exchange variation." The Form 6-K provided the following:

> **The Finance Office (Diretoria Financeira) implemented certain transactions in the financial market, which transactions were related to the variation of U.S. Dollar against Real (Brazilian currency) in amounts above the purpose of protecting the activities of the Company exposed to exchange variation.**
>
> Given the severity of the international crisis, which worsened last week and due to the high volatility of the quote of the U.S. currency, which occurred very quickly, the Board of Directors (Conselho de Administração ), having become aware of the implementation of such transactions, determined the adjustment of the exposure of the Company to standards of risks and limits established as part of its financial and exchange rate policies.
>
> **Accordingly, the Company decided to liquidate in advance certain financial transactions, which resulted in losses of approximately R$ 760,000,000.00.**

37.     This loss of approximately R$760 million dwarfed the Value at Risk figures that the Company had repeatedly disclosed during the Class Period.  The Company disclosed that, as of March 31, 2008, the Value at Risk amount was only approximately R$187 million.  Similarly,

as of June 30, 2008, the Value at Risk was only approximately R$241 million. Moreover, the Company repeatedly informed investors that the amounts of its currency contracts were "nominal" and thus were not recorded in the interim financial information.

38.    The following day on September 26, 2008, the Company filed a Form 6-K with the SEC announcing that it had dismissed Defendant Ferreira as Chief Financial Officer, temporarily replacing him with Defendant Teixeira.

39.    Analysts and investors alike were shocked at these revelations. On September 26, 2008, Sadia's ADR price plunged a massive $5.77, or nearly 38%, to close at $9.50 on heavy trading of over 5 million shares. The following business day, the Company's stock dropped another $1.51 per share, or nearly 16%, to close at $7.99. On the Bovespa, Sadia's stock closed at R$9.30 on September 26, 2008, down R$3.00 for the day. On the LATIBEX, Sadia's stock closed at 2.41 Euros, down 1.10 Euros for the day.

40.    In an article on September 26, 2008, *Bloomberg* reported the following:

Sadia SA, Brazil's second-biggest food company, said it increased its short- and medium-term debt to help cover a 760 million-real ($410 million) loss from currency operations.

Sadia will operate with higher debt levels in coming months, Welson Teixeira Jr., who was named chief financial officer today, said on a conference call.

41.    In a separate article on the same date, *Bloomberg* reported the fallout from the Company's announcements:

Sadia SA, Brazil's second-biggest food company, plunged the most in at least 14 years after the company fired its chief financial officer.

Sadia fell 2.42 reals, or 26 percent, to 6.88 reals at 10:43 a.m. in Sao Paulo trading. It was the biggest drop since at least August 1994. Shares of the Concordia, Brazil-based company declined 8.1 percent this year through yesterday.

Sadia said in a statement late yesterday that its board dismissed CFO Adriano Lima Ferreira after the company posted a loss from currency-related investments. Welson Teixeira Jr. will replace him, Sadia said.

42.     Also on September 26, 2008, Moody's downgraded Sadia to Ba3 from Ba2 as a result of the Company's massive loss.  A *Bloomberg* article issued on this same date discussed the downgrade:

> Moody's downgraded all ratings related to Sadia S.A. ("Sadia") to Ba3 from Ba2 following the announcement of some BRL 760 million in cash losses from positions in currency forward contracts and counterparty losses in its offshore investment portfolio.
>
> The ratings remain under review for possible further downgrade.
>
> Ratings affected are as follows:
>
> -- Local currency corporate family rating: to Ba3 from Ba2
>
> -- USD 250 million in guaranteed senior unsecured notes due 2017 issued by Sadia Overseas Ltd. with an unconditional and irrevocable guarantee from Sadia: to Ba3 from Ba2.
>
> All ratings remain under review for possible further downgrade.
>
> The rating action reflects the expected increase in Sadia's adjusted total debt to EBITDA ratio to well above 4.0x as a result of new short term bank debt that has been raised over the past weeks to cover the derivatives and counterparty losses. Moody's also expects interest coverage to weaken as a result of the additional debt, with adjusted EBITA to Gross Interest Expenses below 2.0x in the near term. On July 18, 2008, Moody's changed its outlook on Sadia's ratings from positive to stable and stated that the rating could be downgraded if adjusted total debt to EBITDA were to be above 4.0 times or adjusted EBITA to interest expense were to drop below 2.0 times.
>
> The review of Sadia's ratings will focus primarily on its overall exposure to derivatives instruments and counterparty risk and the degree of potential impact on the company's leverage and liquidity. If Sadia's leverage and liquidity profile remains in line with the pro-forma position after yesterday's announcement and today's conference call, Moody's would likely stabilize the rating at Ba3, one notch lower than its previous rating, to reflect the increased leverage and weaker than expected risk controls and board supervision. The rating could come under further downward pressure if Sadia's adjusted LTM total debt to EBITDA exceeds

5.0x for two consecutive quarters or if Sadia's liquidity is pressured by weaker access to bank export trade finance lines.

43.     On October 6, 2008, the Company announced that Defendants Filho and d'Avila had resigned from their positions as Chairman and Vice Chairman, respectively amid a probe into the Company's currency hedge losses.  In a Form 6-K filed the next day with the SEC to announce the resignations, the Company stated as follows:

> In compliance with the provisions set forth in Paragraph 4 of Art. 157 of Law N. 6.404/76, SADIA S.A. (the "Company") announces to its shareholders and to the market that Mr. Walter Fontana Filho, Chairman, and Mr. Eduardo Fontana d'Avila, Vice-Chairman, presented their resignation letters as board members in the Extraordinary Board Meeting held on 10.06.2008.  Sadia S.A.  also announces that the resignations have been accepted by all members of the Board, which decided to nominate,  *ad referendum*  to the next General Shareholders Meeting, Mr. Luiz Fernando Furlan as responsible for the functions of Chairman. The Board also decided not to fill the vice-chairman vacant post and not to attribute its functions, for the time being, to any member.

44.     On this same date, *Bloomberg* published an article discussing the resignations and the probe into the Company's currency hedge losses:

> Sadia SA, the Brazilian food company that fired its chief financial officer after posting a hedging loss, said the chairman and vice chairman resigned amid a probe into the loss.
>
> Luiz Fernando Furlan, Brazil's former trade minister, will take over as chairman, replacing Walter Fontana Filho, Sadia said today in a statement. Vice Chairman Eduardo Fontana d'Avila also resigned.
>
> Sadia, Brazil's second-biggest food company, said late last month that it fired Chief Financial Officer Adriano Lima Ferreira and posted a 760 million-real ($346 million) hedging loss. Brazil's real has plunged 28 percent against the dollar since the start of August, the worst performance of the 16 most-traded currencies.
>
> * * *
>
> Sadia shares fell 31 centavos, or 5.3 percent, to 5.60 reals in Sao Paulo trading. The stock has declined 45 percent this year.
>
> **Standard & Poor's lowered its long-term credit rating on Sadia by one notch to "BB," or two levels below investment grade, from "BB+," and put the rating on**

***negative outlook, citing the weakening of the company's position following the hedging losses***.

45.     In addition, as a result of Sadia's losses in connection with the currency hedge bets, the Company has had to postpone several projects and is in a critical financial downswing. On October 17, 2008, *Bloomberg* reported the following:

> ***Sadia SA will postpone investments and is asking suppliers for discounts after losing 760 million reals ($356.8 million) on currency-related derivatives***, Valor Economico reported.
>
> Sadia plans to delay plans to build a 150 million-real plant in the United Arab Emirates and another facility in Santa Catarina state, whose cost is estimated at 700 million reals, Valor said, citing Chairman Luiz Fernando Furlan.
>
> The company sent a letter to its suppliers asking for a 10 percent discount in October, November and December, the newspaper said, citing a copy of the letter.

## DEFENDANTS' FAILURE TO REVEAL THE TRUTH

46.     Sadia's statements and filings during the Class Period were materially false and misleading because they (1) misrepresented the true earnings and financial condition of the Company; (2) failed to disclose the material adverse non-public information that Sadia was entering into significant currency derivative contracts; (3) failed to disclose that such contracts violated the Company's hedge policy in that they covered a period of time and encompassed amounts far greater than necessary to protect the Company's interests; (4) failed to disclose that the currency contracts were not "nominal" in nature and should have been accounted for in the Company's financial statements; and (5) failed to maintain adequate internal and financial controls, such that the statements by the Company's officers and directors during the Class Period representing that the Company's market risks were managed effectively lacked in any reasonable basis given the magnitude of the Company's losses attributed to its currency hedge contracts.

47.     During the Class Period, the Company dismissed the amount at risk related to its currency contracts as "nominal."   However, with the revelations of the true state of the Company's financial prospects and its exposure to currency fluctuations, the investing community learned that (i) the currency contracts entered into by Sadia were massive, resulting in a loss of R$760 million; (ii) the Company had inadequate internal and financial controls to assess it vulnerability to fluctuations in currency markets; and (iii) as a result of its losses, the Company would be hindered in its business and growth strategy moving forward, endangering its market position and future viability.

48.     Indeed, as a result of the Company's false and misleading statements and omissions during the Class Period, Sadia fired its Chief Financial Officer and accepted the resignations of its Chairman and Vice Chairman.

49.     In addition to the false and misleading statements described in detail herein, Defendants also failed to disclose the truth regarding Sadia's financial condition.   Specifically, and in addition to the other omissions described herein, Defendants failed to tell the public the true risks the Company faced with regard to its exposure to currency derivative contracts, and failed to disclose that the Company was operating with inadequate internal and financial controls.   As a result, Sadia's reported financial results were materially false and misleading.

## UNDISCLOSED ADVERSE INFORMATION

50.     The market for Sadia's securities was an open, well-developed and efficient market at all relevant times.   As a result of the materially false and misleading statements and failures to disclose described herein, Sadia's securities traded at artificially inflated prices during the Class Period.   Plaintiff and the other members of the Class purchased or otherwise acquired

Sadia's securities relying upon the integrity of the market price of Sadia's securities and market information related to Sadia, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sadia's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Sadia's business, prospects and operations.

53.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Sadia and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

54.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents

would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

55.     As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Sadia, their control over, receipt and/or modification of Sadia's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Sadia, participated in the fraudulent scheme alleged herein.

56.     The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Sadia ADRs and/or common stock on the NYSE, Bovespa or LATIBEX during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Sadia and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

58.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, Sadia ADRs and common stock were actively traded on the NYSE, Bovespa and LATIBEX (open and efficient markets). As of March 12, 2008, the Company had over 29.9 million ADRs outstanding. Record owners and other members of the Class may be identified from records maintained by Sadia and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

59.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

61.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Sadia;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Sadia;

e.      whether the market price of Sadia common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## STATUTORY SAFE HARBOR

63.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

64.     Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, Defendants knew the forward-looking

statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Sadia who knew that such statement was false when made.

## LOSS CAUSATION

65.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Sadia's securities and operated as a fraud or deceit on Class Period purchasers of Sadia's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Sadia's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Sadia's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

66.     By failing to disclose the extent of the Company's currency derivative contracts, investors were not aware of the true state of the Company's financial status.   Therefore, Defendants presented a misleading picture of Sadia's business and prospects.  Thus, instead of disclosing during the Class Period the true state of the Company's business, Defendants caused Sadia to conceal the truth.

67.     Defendants' false and misleading statements had the intended effect and caused Sadia's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, Sadia's common stock price fell nearly 40% percent immediately following the announcement of the Company's exposure to currency derivative contracts, and continued to decrease over the following days and

months.   This drop removed the inflation from the price of Sadia's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

68.     The decline in the price of Sadia's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of Sadia's ADR and common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.   The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Sadia's securities and the subsequent decline in the value of Sadia's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

69.     At all relevant times, the market for Sadia stock was an efficient market for the following reasons, among others:

a.     Sadia   securities met the requirements for listing, and were listed and actively traded on the NYSE, Bovespa and LATIBEX, all highly efficient markets;

b.     As a regulated issuer, Sadia filed periodic public reports with the SEC and the NYSE;

c.     Sadia securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace; and

d.      Sadia regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

70.     As a result, the market for Sadia securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Sadia's stock price.  Under these circumstances, all purchasers of Sadia securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

**COUNT I**
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants**

71.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

72.     During the Class Period, Sadia and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sadia securities; and (iii) cause Plaintiff and other members of the Class to purchase Sadia securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Sadia and the Individual Defendants, and each of them, took the actions set forth herein.

73.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Sadia securities in violation of §10(b) of the

Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Sadia, as alleged herein.

74.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

75.     Sadia and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Sadia as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sadia's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Sadia and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading,

as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Sadia's securities during the Class Period.

76.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

77.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sadia's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual

Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

78.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sadia securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Sadia shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Sadia securities during the Class Period at artificially inflated high prices and were damaged thereby.

79.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Sadia, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Sadia securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

80.     By virtue of the foregoing, Sadia and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

82.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

83.     The Individual Defendants were and acted as controlling persons of Sadia within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.     As set forth above, Sadia and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)     Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 5, 2008            **LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: /s/ Curtis V. Trinko

Curtis V. Trinko (CT-1838)
Wai K. Chan (WC-0743)
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: 212 490-9550
Fax: 212 986-0158
Email: Ctrinko@trinko.com

**SAXENA WHITE P.A.**
Christopher S. Jones (CJ-4131)
Joseph E. White III
Maya Saxena
2424 N. Federal Highway
Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3082

***Counsel for Plaintiff***

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Riccardo Iaccarino, General Counsel, on behalf of the Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Fund"), certify that:

1. I am authorized by the Board of Trustees of the Funds, to initiate litigation on the Fund's behalf and to execute this Certification.

2. I have reviewed a complaint and I authorize Saxena White P.A., in conjunction with Court appointed lead counsel, to act on the Fund's behalf in this matter in applying for Lead Plaintiff or Class Representative status and for all other purposes in connection with this litigation.

3. The Fund did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Fund is willing to serve as a Lead Plaintiff or Class Representative, either individually or as part of a group. The Fund understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. The Fund not will accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Fund understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Fund's decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all the transactions in the American Depository Receipts (ADR) of SADIA S.A. in the class period, as follows:

| Type of Security  (American Depository Receipts) | Purchase/Acquisition or Sale/Disposition | Price ($) | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| SEE ATTACHED SCHEDULE A | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

8. During the three years prior to the date of this Certification, the Fund has only sought to serve, and has served as a representative party for a class in an action filed under the Private Securities Litigation Reform Act, in the following instances:

In re: Ambac Financial Group Inc., SDNY, Civil Action No. 08-00411-NRB

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 29 day October, 2008

Riccardo Iaccarino
Name (print)

Signature

# SCHEDULE  A TO CERTIFICATION

Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds

American Depository Receipts of Sadia S.A., cusip 786326108

| Date | Purchase/Sale | # of Shares | Price per share ($) | Proceeds/Cost |
|------|---------------|-------------|---------------------|---------------|
| 6/3/2008 | Sale | 1,125 | 24.8683 | $27,976.84 |
| 7/1/2008 | Purchase | 155 | 20.5058 | $3,178.40 |
| 9/2/2008 | Purchase | 2,140 | 19.5986 | $41,941.00 |