**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ X

IN RE SADIA, S.A. SECURITIES
LITIGATION

------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/29/09

**OPINION AND ORDER**

**08 Civ. 9528 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Westchester Putnam Counties Heavy & Highway Laborers Local 60

Benefit Funds, Alan Hyman, Phil Carey, Steve Geist, and Peter Stricker

("Plaintiffs") bring this securities fraud action on behalf of all persons who

purchased or otherwise acquired Sadia, S.A. ("Sadia" or "the Company")

American Depository Receipts ("ADRs") from April 30, 2008 to September 26,

2008 (the "Class Period") to recover losses that resulted from the purchase of

artificially inflated stock.  Plaintiffs assert claims pursuant to Section 10(b) of the

Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against

Sadia and several of its current and former officers.[1]  Plaintiffs also assert claims

---

[1]    The Complaint names the following current and former officers of
Sadia as defendants: its chairman, Luiz Fernando Furlan; its chief executive
officer, Gilberto Tomazoni; its chief financial officer, Welson Teixeira, Jr.; its
former chief financial officer, Adriano Lima Ferreira; its former president and
chairman, Walter Fontana Filho; and its former vice chairman, Eduardo Fontana

under Section 20(a) of the Act against the Individual Defendants. Sadia now

moves to dismiss the Complaint.[2] For the reasons set forth below, Sadia's motion

is denied.

## II.   BACKGROUND[3]

Sadia is a major Brazilian corporation whose primary business is the

production and distribution of refrigerated and frozen food products to retailers

throughout Latin America, the Middle East, Asia, and Europe.[4] In addition to the

Brazilian Sao Paulo Stock Exchange and the Spanish Market for Latin-American

Stocks in Euros, Sadia's stock trades as ADRs on the New York Stock Exchange.[5]

Like other major exporting companies, Sadia engages in currency hedging to

mitigate lost profits when foreign currency paid to it on future sales contracts

---

d'Avila (collectively, the "Individual Defendants").

[2]     In its brief, Sadia attempts to dismiss the Complaint in its entirety.
*See* Memorandum of Law in Support of Defendant Sadia, S.A.'s Motion to
Dismiss ("Def. Mem.") at 1. However, as the Individual Defendants have not filed
a motion to dismiss, this Opinion does not address plaintiffs' claims against the
Individual Defendants.

[3]     The facts are drawn from the Complaint and from documents
incorporated by reference in the Complaint and are presumed to be true for the
purpose of Sadia's motion.

[4]     *See* Complaint ("Compl.") ¶ 2.

[5]     *See id.* ¶ 16.

declines against the value of its native currency before the transactions have been completed.[6] Currency hedging is generally used as a precautionary measure, similar to an insurance policy, to enable exporting companies to reasonably predict the value that they will receive for future sales.[7]

The Complaint alleges that during the Class Period, Sadia entered into currency hedging contracts that were both larger than necessary to insure the Company's losses on future sales and in violation of the Company's internal hedging policy.[8] Plaintiffs contend that Sadia's currency hedging activity was, in reality, a "high risk bet" that carried the Company to the brink of financial ruin when the Brazilian real (R$) depreciated in value against the U.S. dollar.[9] The costs of Sadia's gamble were realized in September 2008, when the real plunged more than twenty percent against the dollar.[10] After the close of trading on September 25, 2008, Sadia announced that it had liquidated various currency hedging contracts, resulting in a loss of approximately R$760 million (U.S. $410

---

6   *See id.* ¶ 28.

7   *See id.* ¶ 3.

8   *See id.* ¶ 31.

9   *See id.* ¶ 28.

10   *See id.* ¶¶ 31-33.

3

million).[11]  Over the next two days, the price of Sadia's ADRs dropped from

$15.27 per share to $7.99 per share, as various credit rating agencies downgraded

the Company's credit rating.[12]  On September 26, Sadia announced that it had fired

defendant Adriano Lima Ferreira as its CFO, replacing him with defendant Welson

Teixeira.[13]  Less than two weeks later, on October 6, 2008, Sadia accepted the

resignations of defendants Walter Fontana Filho and Eduardo Fontana d'Avila.[14]

## III.  LEGAL STANDARD

### A.  Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, the court must "accept as true all of the factual

allegations contained in the complaint"[15] and "draw all reasonable inferences in

the plaintiff's favor."[16]  However, the court need not accord "[l]egal conclusions,

---

[11]  *See id.* ¶ 58.

[12]  *See id.* ¶¶ 60, 65, 72.

[13]  *See id.* ¶ 59.

[14]  *See id.* ¶ 66.

[15]  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[16]  *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

4

deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[17]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[18]

### 1. Pleading Requirements

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[19] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[20] A claim is facially plausible "when the plaintiff

---

[17]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation omitted).

[18]    *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[19]    *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[20]    *See Twombly*, 550 U.S. at 564. *Accord Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (noting that *Twombly*'s standard of plausibility is not limited to antitrust cases).

pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."[21]  Plausibility "is not akin to a

probability requirement;" rather plausibility requires "more than a sheer possibility

that a defendant has acted unlawfully."[22]  Pleading a fact that is "merely consistent

with a defendant's liability" does not satisfy the plausibility standard.[23]

### 2.    Securities Fraud

"Securities fraud claims are subject to heightened pleading

requirements that the plaintiff must meet to survive a motion to dismiss."[24]  These

heightened pleading requirements are imposed by Federal Rule of Civil Procedure

9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[25]

### a.    Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s

requirement that "the circumstances constituting fraud . . . be stated with

---

[21]    *Iqbal*, 129 S. Ct. at 1949 (quotation omitted).

[22]    *Id.* (quotation omitted).

[23]    *Id.* (quotation omitted).

[24]    *ATSI*, 493 F.3d at 99.

[25]    *See* 15 U.S.C. § 78u-4(b).

particularity."[26] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[27] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[28] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[29]

### b.     The PSLRA

The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[30] The PSLRA specifies

---

[26]     Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[27]     *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[28]     *Rombach*, 355 F.3d at 170 (quotation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[29]     *ATSI*, 493 F.3d at 99.

[30]     *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation omitted) (citing 15 U.S.C. § 78u-4(b)(1), (2)). *Accord ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

that the plaintiffs must "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind."[31]  When

evaluating allegations of scienter, the court must look at the complaint as a whole

and "take into account plausible opposing inferences."[32]

        "[A]n inference of scienter must be more than merely plausible or

reasonable – it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent."[33]  In other words, a plaintiff must present a

"strong inference" of scienter.[34]  The inference need not, however, be "irrefutable,

*i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing

inferences."[35]  The inquiry on a motion to dismiss is as follows: "When the

allegations are accepted as true and taken collectively, would a reasonable person

---

[31]     *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

[32]     *Id.* at 323.  These plausible opposing inferences may be based only on
the complaint and other public documents on which courts ordinarily rely in
deciding a motion to dismiss, "while constantly assuming the plaintiff's
allegations to be true." *Id.* at 322, 326-27.

[33]     *Id.* at 314.

[34]     *ECA*, 553 F.3d at 196.

[35]     *Tellabs*, 551 U.S. at 324 (citation omitted).

8

deem the inference of scienter at least as strong as any opposing inference?"[36] "If the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[37]

## B.    Section 10(b) and Rule 10b-5

In order to state a claim under Rule 10b-5 for misrepresentations, a "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[38]  With respect to the first element, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[39]  In situations

---

[36]    *Id.* at 326. *Accord id.* at 324 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

[37]    *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

[38]    *Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[39]    *Rombach*, 355 F.3d at 172 (quotation omitted).

"[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[40]  Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[41]

Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine.  Under the PSLRA's safe harbor provision, forward-looking statements are deemed immaterial and non-actionable when they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements."[42]  However, statements are not protected where defendants "had no basis for their optimistic statements and already knew

---

[40]     *Novak*, 216 F.3d at 309 (citation omitted).

[41]     *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness:  People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." (quotations omitted)).

[42]     15 U.S.C. §78u-5(c)(1)(A).

(allegedly) that certain risks had become reality."[43]  Similarly, under the judicially

created bespeaks caution doctrine, "alleged misrepresentations . . . are deemed

immaterial as a matter of law [if] it cannot be said that any reasonable investor

could consider them important in light of adequate cautionary language. . . ."[44]

Under the "truth-on-the-market" doctrine, information already known on the

market is also immaterial.[45]  Statements may also be deemed immaterial as merely

vague expressions of optimism or puffery.[46]  Lastly, pleadings based on fraud by

hindsight are not actionable as a matter of law.[47]

     Scienter can be pled by "alleging facts (1) showing that the

---

[43]    *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629
(S.D.N.Y. 2003). *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp.
2d 407, 419 (S.D.N.Y. 2000) (observing that the bespeaks caution doctrine "does
not apply where a defendant knew that its statement was false when made").

[44]    *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.
2002).

[45]    *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 159 (2d Cir. 2000)
("The truth-on-the-market defense is intensely fact-specific and is rarely an
appropriate basis for dismissing a § 10(b) complaint for failure to plead
materiality."). *See also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221,
238 (S.D.N.Y. 2006).

[46]    *See ECA*, 553 F.3d at 206; *In re Gildan Activewear, Inc.*, No. 08 Civ.
5048, 2009 WL 1919618, at *9 (S.D.N.Y. July 1, 2009); *In re NTL, Inc. Sec.
Litig.*, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004).

[47]    *See Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 410-11
(S.D.N.Y. 2007).

defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or

recklessness."[48] "Sufficient motive allegations entail concrete benefits that could

be realized by one or more of the false statements and wrongful nondisclosures

alleged."[49] "Motives that are generally possessed by most corporate directors and

officers do not suffice; instead, plaintiffs must assert a concrete and personal

benefit to the individual defendants resulting from the fraud."[50] "To prove liability

against a corporation . . . a plaintiff must prove that an agent of the corporation

committed a culpable act with the requisite scienter, and that the act (and

---

[48]    *ATSI*, 493 F.3d at 99 (citing *Ganino*, 228 F.3d at 168-69). *Accord In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (holding that plaintiffs adequately pleaded scienter because the allegations supported the inference that the company and the officers were at least reckless in not knowing that the financial statements were false and in failing to disclose internal control weaknesses); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 292 (S.D.N.Y. 2006) (holding that plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

[49]    *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation") (quotations omitted)).

[50]    *Id. Accord ECA*, 553 F.3d at 198.

accompanying mental state) are attributable to the corporation."[51]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[52] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[53] "To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor."[54]

---

[51]     *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[52]     *Kalnit*, 264 F.3d at 142. *Accord South Cherry St., LLC v. Hennessee Group LLC*, No. 07 Civ. 3658, 2009 WL 2032133, at *10 (2d Cir. July 14, 2009); *In re Novagold Res. Inc. Secs. Litig.*, No. 08 Civ. 7041, 2009 WL 1575220, at *22 (S.D.N.Y. June 5, 2009) (quoting *ECA*, 553 F.3d at 198-99).

[53]     *South Cherry St.*, 2009 WL 2032133, at *10. (quotation and emphasis omitted). *Accord ECA*, 553 F.3d at 203.

[54]     *Gildan Activewear*, 2009 WL 1919618, at *7 (citations and quotation marks omitted).

## IV.   DISCUSSION

### A.   Actionable Misstatements and Omissions

The Complaint alleges that Sadia's statements and public filings during the Class Period were fraudulent because they: (1) mischaracterized the amount and extent of the Company's exposure under its currency hedging contracts; (2) failed to disclose that Sadia's hedging activity violated the Company's internal hedging policy; (3) misrepresented the existence of adequate controls to prevent excessive hedging; and (4) disguised the Company's true financial condition.  Sadia moves to dismiss plaintiffs' section 10(b) and Rule 10b-5 claim on the ground that the Complaint fails to identify any actionable misstatements or omissions concerning Sadia's hedging activity.[55]  As Rule 10b-5 requires that plaintiffs plead each alleged misrepresentation or omission with specificity, I address each of plaintiffs' claims in turn.

### 1.   Amount and Extent of Sadia's Exposure Under Its Currency Hedging Contracts

Plaintiffs contend that Sadia misrepresented the amount and extent of the Company's exposure under its currency hedging contracts by repeatedly referring to the contracts as "nominal" in its public filings:

---

[55]    *See* Def. Mem. at 16-21.

> The Company, within its hedge strategy, uses currency futures contracts (US dollars, Euros and Pounds), as a form of mitigating exchange rate risk over operating and financial assets and liabilities. The *nominal* amounts of these contracts are not recorded in the interim financial information.[56]

As an initial matter, it is axiomatic that the term "nominal" in the context of a financial disclosure refers to the notional amounts of the currency hedging contracts as opposed to their actual value. Accordingly, it is not plausible that a reasonable investor would interpret Sadia's use of "nominal" as meaning negligible or insubstantial. Moreover, to the extent that plaintiffs contend that they were unfamiliar with this usage of "nominal," they should have been able to glean the term's meaning from the context of the sentence in which it was used.

However, this clarification does not dispose of plaintiffs' claim. Plaintiffs also assert that Sadia's public filings mischaracterized the Company's hedging activity as risk-reducing and non-speculative. The financial disclosures that Sadia filed with the SEC on April 30, 2008 and July 31, 2008 each described

---

[56]    Sadia's Form 6-K filed April 30, 2008 ("April 6-K"), Ex. A to 4/27/09 Declaration of Jonathan D. Siegfried, counsel for Defendant Sadia, S.A. ("Siegfried Decl."), at 48. The entire document is incorporated in the Complaint by reference. *See* Compl. ¶ 46. *See also* Sadia's Form 6-K filed July 31, 2008 ("July 6-K"), Ex. C to Siegfried Decl., at 46. The entire document is incorporated in the Complaint by reference. *See* Compl. ¶ 53.

the Company's hedging activity as a "form of mitigating exchange rate risk."[57]

Additionally, the Form 20-F that Sadia filed with the SEC on June 27, 2008

("Form 20-F"), reporting the Company's results for the 2007 fiscal year, provided:

> The financial department has incorporated a Hedging and
> Investment Policy which was reviewed and approved by
> the Financial Committee. These policies prohibit
> speculative trading and oblige the Company to diversify its
> counterparties. Sadia periodically provides reports to
> senior management about potential risks and actions taken
> to mitigate them.
>
> * * *
>
> The foreign currency swap contracts that are entered by the
> Company are aimed to mitigate potential losses on the
> Company's external revenues derived from the devaluation
> of the dollar. *The Company does not use swap contracts
> for trading on speculative purposes.*[58]

Finally, plaintiffs argue that Sadia's public filings were materially misleading

because the Company's loss of R$760 million "dwarfed the Value at Risk figures

that the Company repeatedly disclosed during the Class Period."[59]  Plaintiffs note

that Sadia's April 6-K reported an estimated VAR of just under R$200 million:

---

[57]     *See id.*

[58]     Form 20-F, Ex. B to Siegfried Decl., at 89-90 (emphasis added).  The
entire document is incorporated in the Complaint by reference. *See* Compl. ¶ 50.

[59]     *Id.* ¶ 59.  "Value at Risk" ("VAR") refers to an SEC-recommended
formula used by Sadia to assess the total value of its assets subject to market risks
at the time of calculation. *See id.* ¶ 32.

> At March 31, 2008, the VAR-Value at Risk for the
> operational assets and liabilities and financial instruments
> exposed to exchange rate variations for one year with
> [ninety-five percent] confidence, amount to R$187,711,
> representing 6.10% of shareholders' equity.[60]

Likewise, the Company's July 6-K reported a VAR of R$241,700, or

approximately 7.68 percent of shareholders' equity.[61]

Sadia argues that although its public filings described its currency

hedging activity as non-speculative, no reasonable investor would have interpreted

these descriptions as implying that the Company's exposure was insubstantial.

*First*, Sadia notes that each of its public filings disclosed the total amount of all of

the Company's currency hedging contracts:

> As of March 31, 2008 the contracted amounts in force
> totaled R$3,120,782 (R$2,251,459 on December 31, 2007)
> and the valuation of these contracts to fair value would
> result in a gain of R$112,776 (loss of R$63,645 on
> December 31, 2007), composed by a gain in the amount of
> R$49,817 accounted for as financial income, and a gain in
> the amount of R$62,959 as operating income.[62]

Similarly, the Company's July 6-K provided:

---

[60]    April 6-K at 48.  All amounts recorded in Sadia's public filings are
stated in thousands of reais (plural of "real").

[61]    July 6-K at 46.  Amount stated in thousands of reais.

[62]    April 6-K at 52.

17

As of June 30, 2008 the contracted amounts in force totaled R$6,438,079 (R$3,120,782 as of March 31, 2008) and the valuation of these contracts to fair value would result in a gain of R$208,050 (loss of R$22,766 as of June 30, 2007), composed by a gain in the amount of R$108,406 (loss of R$21,811 as of June 30, 2007) accounted for as financial income, and a gain in the amount of R$99,642 (loss of R$955 on June 30, 2007) as operating income.[63]

*Second*, Sadia points out that its public filings also reported

the Company's interim gains and losses on its currency hedging contracts.

Immediately following the paragraph referring to the "nominal amounts" of the

Company's currency hedging contracts, Sadia's April 6-K stated:

The realized income of future contracts, for the period ended on March 31, 2008, generated a gain of R$79,794 (R$4,224 for the same period in 2007), represented by [a] gain in the amount of R$30,512 (loss in the amount of R$147 in the same period in 2007) accounted for as financial income in "Monetary Variations Assets," and a gain in the amount of R$49,282 (R$4,371 in the same period of 2007) as operating income in "Gross operating revenue".[64]

Additionally, the Company's July 6-K reported a gain of R$152,263,000 for the

six-month period ending June 30, 2008.[65] Sadia argues that based on the amounts

---

[63]   July 6-K at 50.

[64]   April 6-K at 48.

[65]   July 6-K at 46.

of these disclosures, any reasonable investor would have recognized that its currency hedging contracts were a volatile investment, subject to both substantial gains and substantial losses.

*Third*, Sadia argues that the VAR calculations contained in its public filings were not misleading because each filing explicitly stated that the amounts of the Company's currency hedging contracts were "not recorded in the interim financial information."[66] Sadia notes that both its April 6-K and July 6-K stated that the VAR figures were calculated "for one year with [ninety-five percent] confidence."[67] Accordingly, Sadia asserts that plaintiffs could not have reasonably mistaken these calculations as precise indicators of the Company's vulnerability to market risks.[68]

Notwithstanding Sadia's arguments, I find that plaintiffs have met their pleading burden with respect to Sadia's mischaracterizations of its currency hedging exposure. Sadia repeatedly characterized its currency hedging activity as risk-reducing and non-speculative. These representations were both consistent throughout the Class Period and in line with the common use of currency hedging

---

[66]   April 6-K at 48; July 6-K at 46.

[67]   *Id.*

[68]   Def. Mem. at 11.

contracts.  While Sadia's public filings disclosed the total amount of all of the

Company's currency hedging contracts, these disclosures were neither

conspicuous nor in close proximity to the Company's description of the currency

hedging contracts as risk-reducing and non-speculative.

Moreover, while Sadia's public filings also disclosed the Company's

interim gains and losses on its currency hedging contracts, these figures are

essentially meaningless in isolation from the Company's gains and losses on its

futures sales contracts.  Because the stated purpose of Sadia's currency hedging

contracts was to offset potential losses on the Company's future sales contracts, a

substantial gain on the Company's currency hedging contracts would not

necessarily indicate a substantial profit.[69]

Finally, with respect to the VAR calculations, I am not persuaded that

Sadia's disclaimer that "the nominal amounts of [the currency hedging] contracts

are not recorded in the interim financial information"[70] was so clear as to eliminate

any potential confusion.  *First*, the disclaimer does not specifically state that the

---

[69]     Indeed, a reasonable investor familiar with the practice of currency
hedging might well assume that Sadia's substantial gains on its currency hedging
contracts meant that the Company had suffered equally substantial losses on its
future sales contracts.

[70]     April 6-K at 48; July 6-K at 46.

amounts of the Company's currency hedging contracts are not reflected in the VAR estimates. *Second*, the disclaimer neither immediately precedes nor directly follows the VAR calculation in any of the Company's Class Period filings.

*Third*, I find Sadia's argument that the VAR calculations were not intended to appear to shareholders as precise indicators of the Company's vulnerability to market risks unconvincing. As an initial matter, the only legitimate reason to include these calculations was to provide the Company's shareholders with an accurate picture of Sadia's market vulnerability. Further, because Sadia was aware that the VAR calculations did not reflect the amounts of its currency hedging contracts — and that these contracts exposed the Company to substantial risk — Sadia was presumably also aware that the VAR calculations did not track the Company's exposure to market risks with any considerable degree of certainty. In this light, Sadia's representation that the VAR estimates were calculated with ninety-five percent confidence appears particularly deceptive. Accordingly, it is plausible that a reasonable investor could have been misled by Sadia's characterizations of the Company's exposure under its currency hedging contracts.[71]

---

[71]    *See Lapin*, 506 F. Supp. 2d at 238 ("[A] complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested.") (quotation and emphasis omitted).

## 2. Compliance with Sadia's Internal Hedging Policy

Plaintiffs also contend that Sadia's public filings were fraudulent because they failed to reveal that the Company had entered into currency hedging contracts in violation of its internal hedging policy.[72]  In their brief, plaintiffs attempt to supplement their allegations by drawing upon documentary evidence that was discovered after the filing of the Complaint.[73]  However, as plaintiffs concede that they did not rely on these documents in drafting their Complaint,[74] these documents cannot be considered in deciding Sadia's motion to dismiss.[75]

Sadia asserts that its currency hedging contracts were in compliance with the Company's internal hedging policy when it filed its July 6-K on July 31,

---

[72]    *See id.* ¶ 57.

[73]    *See* Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sadia, S.A. ("Pl. Mem.") at 5-7.

[74]    *See id.* at 5.

[75]    *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("In considering a motion under [Rule] 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint. If, on such a motion, matters outside the pleading are presented to and not excluded by the court, the court should normally treat the motion as one for summary judgment pursuant to [Rule] 56.") (quotation omitted).  Here, neither party has suggested converting the motion to dismiss into a motion for summary judgment.  Additionally, the Court has not provided the parties an opportunity to argue for or against summary judgment.

2008.[76] Specifically, Sadia cites to a statement made by its investor relations manager ("IRM") during a September 26, 2008 conference call in which the manager assured investors that the Company's "exposure in June . . . was fully in compliance with the [Company's] finance policy."[77] Sadia's reliance on this statement is misplaced for two reasons. *First*, the September conference call took place *after* Sadia had suffered its R\$760 million loss and nearly two full months *after* it had filed its July 6-K. *Second*, the IRM's statement, at best, raises an issue of fact that cannot be decided at the motion to dismiss stage.

Sadia further argues that even if plaintiffs could establish that it had entered into currency hedging contracts in violation of its internal hedging policy, allegations that a corporation violated its own internal policy "amount to nothing more than a charge that [the company's] business was mismanaged," and therefore cannot form the basis of Rule 10b-5 claim.[78] However, there is considerable authority for the proposition that a company's failure to follow an internal policy

---

[76]    Def. Mem. at 18.

[77]    Transcript of 9/26/08 International Conference Call ("September conference call"), Ex. E to Siegfried Decl., at 5.

[78]    Def. Mem. at 19 (citing *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) ("[t]he securities laws were not designed to provide an umbrella cause of action for the review of management practices")).

can form the basis for an inference of recklessness.[79]  Additionally, *In re Citigroup, Inc. Securities Litigation*, upon which Sadia relies, is distinguishable from the case at bar because Sadia's alleged failure to adhere to Company policy was intended to deceive *its own* shareholders, not investors in the securities of other companies.[80]

Finally, Sadia asserts that even if it failed to reveal that it had violated its own internal hedging policy, plaintiffs were not misled by this omission because Sadia never publicly disclosed the details of its internal hedging policy.[81] This argument fails for two reasons.  *First*, Sadia's contention that it never publicly disclosed its internal hedging policy is directly contradicted by the Complaint's quotation from a July 31, 2008 conference call, in which a Sadia

---

[79]     *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("[D]efendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."); *Novak*, 216 F.3d at 311 (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy").

[80]     *See Citigroup*, 330 F. Supp. 2d at 377 (dismissing a complaint based on plaintiff's failure to allege fraud in connection with the sale of issuer's own securities).

[81]     Reply Memorandum of Law in Further Support of Defendant Sadia, S.A.'s Motion to Dismiss ("Def. Reply") at 7.

spokesperson explicitly referenced the Company's internal hedging policy.[82]

*Second*, where, as here, an alleged omission forms the basis of the plaintiffs'

claim, plaintiffs are not required to affirmatively plead facts establishing the

element of reliance.[83]   Accordingly, plaintiffs' allegations regarding Sadia's failure

to reveal that it had entered into currency hedging contracts in violation of its

internal hedging policy suffice to state a Rule 10b-5 claim.[84]

### 3.    Existence of Adequate Internal Controls

Plaintiffs also claim that Sadia's statements and public filings,

including the Sarbanes-Oxley certifications that Sadia filed with the SEC on June

27, 2008, misrepresented the existence of adequate controls to monitor the

Company's exposure to exchange rate variations.[85]   As a preliminary matter, Sadia

---

[82]   *See* Compl. ¶ 56 ("As you know in relation to currency we have historically been very active and we do have a policy where we hedge [one hundred percent] of our net exposure for the three following months and from the third to the [twelfth] month is [fifty percent] and then it is ongoing.").

[83]   *See Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) ("[W]e previously have dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendant's wrongful conduct had been established.").

[84]   Although Sadia raises the issue of transaction causation in passing, it does not appear to challenge the Complaint's pleading of loss causation.

[85]   *See* Compl. ¶ 57.

asserts that the Sarbanes-Oxley certifications that it filed with the SEC attested to the accuracy of the financial information disclosed in the Company's public filings, not the adequacy of the Company's internal controls for monitoring its currency hedging activity.[86] However, the Sarbanes-Oxley certification cited in the Complaint plainly required Sadia's certifying officers to disclose:

> Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.[87]

Here, the Complaint alleges that Sadia's senior officers knowingly concealed that the Company had entered into substantial high-risk currency hedging contracts in violation of its internal hedging policy.[88] Therefore, to the extent that plaintiffs base their allegations on the representations made in the Sarbanes-Oxley certifications, they have met their pleading burden.

However, plaintiffs' latter claim — that Sadia represented it had adequate controls to monitor its currency hedging activity when it actually did not — is belied by the allegations in the Complaint. *First*, the Complaint alleges that

---

[86]    *See* Def. Reply at 8.

[87]    Compl. ¶ 52.

[88]    *See id.* ¶ 57.

26

defendants were aware that Sadia's statements and public filings were fraudulent because they "permanently and closely monitored their positions, risk and potential exposure in financial instruments."[89]  *Second*, plaintiffs assert that defendants knew that Sadia was engaged in hedging activity in excess of its internal policy precisely because of the sufficiency of the Company's system for reporting "Out-of-Policy" warnings.[90]  *Third*, plaintiffs unwittingly concede that Sadia had a method in place for monitoring the Company's exposure to market risks by acknowledging that Sadia included VAR calculations in each of its public filings.[91]  Therefore, plaintiffs' contention that Sadia misrepresented the existence of adequate internal controls for monitoring the Company's currency hedging activity cannot form the basis of their Rule 10b-5 claim.

### 4.    Sadia's Financial Condition

Finally, plaintiffs claim that Sadia's public statements during the Class Period were fraudulent because they disguised the true financial condition of the Company.[92]  Plaintiffs principally rely on press releases issued by Sadia on

---

[89]    *Id.* ¶ 84.

[90]    *See id.* ¶¶ 39-41; Pl. Mem. at 21-22.

[91]    *See* Compl. ¶ 59.

[92]    *See id.* ¶ 57.

April 30, 2008 and July 31, 2008 summarizing the contents of the Company's

public filings. Plaintiffs contend that both press releases were fraudulent because

"they reinforced the notion that Sadia's financial position was strong and that

foreign exchange variations were managed in a conservative manner."[93]

Plaintiffs' claim fails for two reasons. *First*, neither of the press

releases cited by plaintiffs states that the Company's currency hedging strategy

was conservative. While the April 30, 2008 press release represented that the

Company managed its investments "to preserve assets and liabilities on a

consolidated basis," this statement is vague and appears to refer to Sadia's entire

investment management strategy, not its currency hedging activity in particular.[94]

*Second*, with respect to plaintiffs' contention that Sadia's press

releases overstated the strength of the Company's true financial position, the

Complaint does not plead any facts suggesting that these statements were

inaccurate at the time they were issued. Even if Sadia consistently misrepresented

its exposure under its currency hedging contracts, the Company's relative financial

condition was not affected until the Brazilian real began its decline against the

---

[93]     *Id*. ¶¶ 48, 55.

[94]     *Id* ¶ 48. Sadia's July 31, 2008 press release does contain language
that might be reasonably construed as characterizing the Company's asset
management strategy as conservative. *See id.* ¶ 55.

28

dollar in August 2008.  Therefore, plaintiffs' contention that Sadia's public

statements misrepresented the true financial condition of the Company cannot

form the basis of plaintiffs' securities fraud claim.

**B.     Scienter**

Having sufficiently alleged actionable misstatements and material

omissions, plaintiffs are still required to "state with particularity facts giving rise

to a strong inference that [each] defendant acted with the required state of mind."[95]

The Complaint does not allege any facts suggesting that defendants had the motive

to commit fraud.  Rather, plaintiffs assert that defendants' intent to deceive — or

reckless disregard for the truth — is demonstrated by substantial circumstantial

evidence supporting a strong inference of scienter.[96]  Sadia, in turn, argues that the

Complaint's allegations of scienter are too conclusory to satisfy the heightened

pleading requirements imposed by the PSLRA.

The allegations in the Complaint, taken as true, sufficiently plead that

the conduct of Sadia's officers and agents was "highly unreasonable" and "an

---

[95]     *Campo v. Sears Holdings Corp.*, No. 06 Civ. 4053, 2009 WL
2151289, at *4 (S.D.N.Y. July 21, 2009).

[96]     *See* Compl. ¶ 22.

extreme departure from the standards of ordinary care."[97]  The Complaint pleads

the following facts as the basis for plaintiffs' allegations of scienter: (1) the

statements and omissions that the Company made with reckless, if not knowing,

disregard for the truth; (2) the termination of Ferreira;[98] (3) the resignations of

Filho and d'Avila;[99] (4) Sadia's IRM's acknowledgment of certain transactions

that were "unaligned" with Sadia's hedging policy and approved by the Board of

Directors;[100] (5) Furlan's suggestion of a possible "intentional flaw" committed by

a senior officer;[101] and (6) the Company's initiation of a Special Audit to

investigate possible violations of Brazilian law.[102]

   Additionally, the testimony of three confidential witnesses ("CWs")

provides a sufficient basis to support the inference that Sadia's officers and agents

were aware that Sadia's public filings and statements were misleading as to the

extent of the Company's exposure under its currency hedging contracts.

---

[97] *Kalnit*, 264 F.3d at 142.

[98] *See* Compl. ¶ 59.

[99] *See id.* ¶ 66.

[100] *See id.* ¶ 61.

[101] *See id.* ¶ 71.

[102] *See id.* ¶ 73.

According to the Complaint, all three CWs occupied positions within Sadia

through which they were privy to the Company's system for monitoring its

financial assets and liabilities.[103]  CW 1 testified that the Individual Defendants, by

virtue of their office, participated in weekly meetings during the Class Period to

discuss sales, marketing efforts, and other operational issues.[104]  CW 1 further

testified that immediately prior to the beginning of the Class Period, Sadia's senior

officers significantly curtailed the flow of information regarding the Company's

financial activities to lower-level employees.[105]  CW 2 testified that Ferreira could

not have been Sadia's only senior officer who was aware of the full extent of the

Company's currency hedging exposure.[106]  CW 2 also testified that despite their

involvement in the lead-up to the Company's R$760 million loss, Sadia's senior

officers had attempted to pin sole responsibility for the Company's financial

failings on Ferreira.[107]  Similarly, CW 3 testified that Ferreira did not act alone in

---

[103]   *See id.* ¶¶ 38, 43, 44.

[104]   *See id.* ¶ 38.

[105]   *See id.*

[106]   *See id.* ¶ 43.

[107]   *See id.*

directing Sadia's currency hedging scheme.[108]

Finally, the Complaint references an organizational chart, derived
from materials that Sadia prepared for an October 30, 2008 conference call,
purporting to show the flow of information regarding the Company's currency
hedging activity from low level employees to Sadia's senior officers. According
to the chart, Sadia's Risk Management Committee received reports detailing the
Company's hedging activity on a daily basis.[109] Additionally, the chart indicates
that Sadia's Board of Directors was supposed to receive an "Out-of-Policy"
warning when the Company's currency hedging activity deviated from its internal
hedging policy.[110] Based on the testimony of the confidential witnesses and the
information presented in the organizational chart, it is unlikely that Sadia's agents
and officers were unaware of the speculative nature of the Company's currency
hedging contracts at the time they issued the misstatements.[111]

To prove liability against Sadia, plaintiffs must establish that "an

---

[108]   *See id.* ¶ 44.

[109]   *See id.* ¶ 40.

[110]   *See id.*

[111]   I note that Sadia has failed to suggest an opposing inference that is
more plausible than the strong inference of scienter on the part of the Individual
Defendants.

32

agent of the corporation committed a culpable act with the requisite scienter, and

that the act (and accompanying mental state) are attributable to the corporation."[112]

As plaintiffs have sufficiently alleged that the agents and officers of Sadia

committed culpable acts with the requisite scienter, they have sufficiently pled

scienter as to Sadia.

## V.    CONCLUSION

For the foregoing reasons, Sadia's motion to dismiss is denied. The

Clerk of the Court is directed to close this motion (Doc. No. 27).  A conference is

scheduled for August 19 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              July 29, 2009

---

[112]     *Teamsters*, 531 F.3d at 195.

33

## - Appearances -

**For Plaintiffs:**

Curtis Victor Trinko, Esq.
Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
(212) 490-9550

Catherine A. Torell, Esq.
Cohen, Milstein, Sellers & Toll,
    P.L.L.C.
150 East 52nd Street, 30th Floor
New York, New York 10022
(212) 838-7797

Lester R. Hooker, Esq.
Maya Saxena, Esq.
Christopher Steven Jones, Esq.
Saxena White P.A.
2424 N. Federal Highway
Boca Raton, Florida 33431
(561) 394-3399

**For Defendant Sadia, S.A.:**

Lawrence Steven Hirsh, Esq.
Jonathan Dick Siegfried, Esq.
John Eric Schreiber, Esq.
James P. Smith, III, Esq.
Dewey & LeBouef, LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

John J. Gross, Esq.
Christopher L. Nelson, Esq.
Katharine M. Ryan, Esq.
Barroway Topaz Kessler Meltzer &
    Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Joseph E. White, Esq.
Milberg, LLP
5200 Town Center Circle, Suite 600
Boco Raton, Florida 33486
(561) 361-5000