IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                               )
In Re SADIA S.A. SECURITIES LITIGATION     )        Case No. 1:08-CV-09528 (SAS)
                                               )
                                               )
                                               )
                                               )
                                               )
_____)

**EXPERT REPORT OF MARC VELLRATH, PH.D., CFA**

**DECEMBER 14, 2009**

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................ 1

    A.  *Qualifications* ............................................................................................. 1

    B.  *Assignment* ................................................................................................. 2

    C.  *Summary of Opinions* ................................................................................. 4

II. CASE OVERVIEW AND BACKGROUND ................................................................. 4

    A.  *Background* ................................................................................................. 4

    B.  *An Explanation of ADRs* ............................................................................ 7

    C.  *The Efficient Market Hypothesis* ............................................................. 10

III. BASIS OF OPINIONS ........................................................................................... 12

    A.  *Trading Volume* ........................................................................................ 13

    B.  *Security Analysts* ...................................................................................... 14

    C.  *Market Makers and Arbitrageurs* ........................................................... 15

    D.  *Eligibility to File Form S-3* ..................................................................... 15

    E.  *Empirical Evidence of Unexpected Corporate Events Causing an Immediate Response in Stock Price* ........................................................ 17

    F.  *Artificial Inflation in the Price of Sadia's ADRs* ................................... 22

IV. CONCLUSION ...................................................................................................... 32

## I.    INTRODUCTION

### A.    *Qualifications*

1.    My name is Marc Vellrath.  I am an economist and financial analyst, and the Chairman and CEO of Finance Scholars Group, a consulting firm with offices in California, New York, Texas, and Illinois.  I hold M.S. and Ph.D. degrees in economics from Carnegie Mellon University, an MBA degree from the University of Washington, and a BA degree from the University of Pennsylvania.  I also have earned the Chartered Financial Analyst designation, or CFA, awarded by the CFA Institute, which is the preeminent professional organization of security analysts and investment managers throughout the world.

2.    Before organizing Finance Scholars Group in July 2006, I was the Director of the Finance and Commercial Damages Practice at ERS Group, a large, national economic consulting firm.  Prior to joining ERS Group in 2004 (as a result of a merger), I was a Principal and founder of KeyPoint Consulting LLC, which provided economic and financial analysis of issues arising in complex business litigation.  Before founding KeyPoint in 1996, I was a Vice President and Principal of Analysis Group, Inc., an economics consulting firm, for six years, and a senior economist with Ernst & Young, an international accounting and consulting firm, for five years. For a total of eight years, I served on the faculties of the graduate schools of business of New York University and the University of Washington.  I also have taught in the loan officer training programs of two large commercial banks, Morgan Guaranty Trust Company and Chemical Bank of New York, and have been a contract researcher for Frank Russell Company, a pension fund advisory firm.

3.    I have conducted numerous investigations and consulting engagements involving a variety of economic and financial issues in many different industries.  As a consultant to law

firms, I have investigated economic and financial issues, including damages, arising in disputes involving securities fraud, antitrust, patent infringement, fraud and fraudulent conveyances, breaches of fiduciary duty, contract breaches, and other matters.  As a consultant to businesses and governmental agencies, I have prepared strategic plans, marketing plans, feasibility studies, valuations, and various other studies to improve management decision-making, increase productivity and efficiency, control costs, and, in the case of corporations, raise profits.

4.    My consulting work for law firms includes extensive work on a variety of financial issues arising in securities matters.  For example, I have written a number of expert reports on the informational efficiency of markets for various securities.  I also have prepared Plans of Allocation, for both private parties and for the U.S. Securities and Exchange Commission ("SEC"), which set forth procedures for allocating settlement funds in securities fraud cases.  In 2006, I was the lead expert on damages for the Enron Task Force of the U.S. Department of Justice and prepared expert reports on the harm caused by the so-called "Broadband" fraud at Enron and by the fraudulent conduct for which Jeffrey Skilling and Kenneth Lay were convicted in their criminal trials.

5.    Exhibit I to this report is a copy of my resume.  This includes a list of my consulting activities and testimony over the past four years.   I am being compensated for my work on this engagement at my standard hourly rate for consulting services, which is $625.  The hourly rates for professionals assisting me on this engagement range between $125 and $500.

*B.    Assignment*

6.    I have been retained by Saxena White P.A. and Barroway Topaz Kessler Meltzer and Check, LLP to analyze certain economic and financial issues arising in the matter of *In Re Sadia S. A. Securities Litigation.*  Specifically, I have been asked to examine the efficiency of the

market for American Depository Receipts ("ADRs") of Sadia S.A. ("Sadia" or the "Company") between April 30, 2008 and September 26, 2008 (the "Class Period"), and to determine whether and the extent to which the price of Sadia's ADRs was artificially inflated during this period. I understand that I have been asked to examine these issues in connection with the plaintiffs' claims that (a) class members relied upon the integrity of the market in which Sadia's ADRs traded when they purchased Sadia's ADRs during the Class Period, (b) the price of Sadia's ADRs was artificially inflated during the Class Period, and (c) class members who purchased Sadia's ADRs during the Class Period suffered damages when the price of Sadia's ADRs fell sharply in response to Sadia's disclosure, after the close of trading on September 25, 2008, that (i) the Company had entered into currency contract positions that were not designed to hedge underlying business risks, but instead were outright speculation and (ii) the Company had lost approximately R$760 million ($410 million) when the dollar-real exchange rate moved against these speculative positions.

7.      In preparing this report, I reviewed and considered relevant pleadings and filings, certain documents produced by the parties to this litigation, and information and data which staff working at my direction or I myself gathered from public sources. Exhibit II to this report is a list of the materials that I considered in the course of my investigation.

8.      This report contains my findings and opinions as of December 14, 2009. My analysis is ongoing, however, and my opinions may change if additional information relevant to the issues I have examined comes to my attention. If requested to do so by counsel, I may undertake additional analyses of issues not addressed in this report – including but not limited to evaluating and responding to opinions expressed by experts for the Defendants in this matter – and may develop further findings and opinions as a result of such analyses.

C.    *Summary of Opinions*

9.    Based on the analyses and findings presented later in this report, I hold the following opinions:

- An analysis of the five factors outlined in the Cammer decision[1] and other relevant information and data support a finding that the market for Sadia's ADRs was semi-strong form ("SSF") efficient during the Class Period. Establishing the semi-strong form efficiency of a market provides a sound economic foundation for reliance on the "fraud on the market" doctrine.[2]

- An event study of daily movements in the price of Sadia's ADRs and other relevant information and data support a finding that the price of Sadia's ADRs was artificially inflated throughout the Class Period by an amount (and percentage) that varied over the course of the Class Period; by the end of the Class Period, the artificial inflation in the price of Sadia's ADRs was approximately $5.62 per share, or approximately 37% of the pre-disclosure price of Sadia's ADRs.

## II.    CASE OVERVIEW AND BACKGROUND

A.    *Background*

10.    Sadia is a publicly traded company, headquartered in São Paulo, Brazil[3] that had a market capitalization of approximately $3.78 billion on December 31, 2007.[4]  The company was originally incorporated in 1944 and has grown to be one of Brazil's leading vertically integrated producers of processed products, poultry, pork and beef.[5]  Sadia has been listed on the São Paulo Stock Exchange ("Bovespa") since 1971[6] where it has both common stock and preferred stock listed.  Additionally, Sadia's preferred stock is listed in Spain as part of the International Latin American Market ("Latibex").  Finally, Sadia has had ADRs – the securities at issue in this

---

[1] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the "*Cammer* decision" or "*Cammer*").
[2] See Section II.C. for a discussion of the different forms of market efficiency.
[3] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, p.26.
[4] Based on prices quoted on the Brazilian stock exchange. Sadia S.A. Form 20-F/A for the year ended December 31, 2008, at F-33; Bloomberg.
[5] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, pp.26-27.
[6] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, pp.26-27.

litigation – listed on the New York Stock Exchange ("NYSE") since April 2001.[7]  Throughout this report, when referring to Sadia-issued securities, I use prices quoted in Brazilian Real ("BRL") for Sadia's common and preferred stock (traded on the Bovespa), after conversion to US Dollars ("USD") using the prevailing foreign exchange rate on the relevant day.  For Sadia's ADRs, I use prices for the ADRs from the NYSE, which are reported in USD.

11.      Over 45% of Sadia's revenue is derived from export markets.[8]  The Company uses distribution and sales centers located throughout Brazil, Latin America, the Middle East, Asia, and Europe to export approximately a thousand different products to a hundred countries.[9] Due to the nature of its business, Sadia's profitability and its ability to service debt is affected by fluctuations in the exchange rate between the "BRL" and the USD.[10]  Sadia therefore used currency futures contracts to manage its exposure to changes in the exchange rate between the BRL and USD.[11]  According to Sadia's disclosures, its foreign currency transactions were "permanently monitored by the Financial Committee and by the Commodities and Risk Management Committee…who [were] responsible for defining management's strategy for administering these risks, determining the limits for positions, exposure and authority for decision making."[12]

12.      The Plaintiffs in this matter allege that during the Class Period, Sadia and its officers, Gilberto Tomazoni (CEO), Welson Teixeira, Jr. (current CFO), Adriano Lima Ferreira (CFO during the Class Period), Walter Fontana Filho (President and Chairman during the Class Period), and Eduardo Fontana d'Avila (Vice Chairman during the Class Period) (collectively, the

---

[7] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, pp.26-27.
[8] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, p.34.
[9] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, p.32.
[10] Sadia S.A. Form 20-FA for the year ended December 31, 2007, p.7.
[11] Sadia S.A. Form 6-K filed on April 30, 3008.
[12] Sadia S.A. Form 6-K filed on April 30, 3008.

"Defendants"), "failed to disclose material adverse facts about the Company's financial well-being and future prospects."[13]  In particular, the Plaintiffs allege that "Defendants failed to disclose or indicate: (1) that Sadia entered into currency derivative contracts to hedge against U.S. dollar exposure that were far larger than necessary; (2) that such contracts violated the Company's hedge policy; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made."[14]  The Plaintiffs claim that as a result of the Defendants' wrongful actions, investors who purchased Sadia's ADRs have suffered significant losses and damages.

13.    According to the Plaintiffs, the Defendants' actions and their impact came to light after the close of trading on September 25, 2008, when Sadia revealed that it had incurred losses of approximately R$760 million ($410 million) related to certain currency contract positions.[15] The revelations about these losses caused Sadia's ADRs to drop by $5.77 per ADR on September 26, 2008.  Overall, the Company's market capitalization dropped by approximately $1.05 billion that day.[16]  Additionally, "credit rating agencies downgraded Sadia, the Company fired its Chief Financial Officer, and the Chairman and Vice Chairman resigned from the Company."[17]

---

[13] Consolidated Amended Complaint dated March 16, 2009, p.3.
[14] Consolidated Amended Complaint dated March 16, 2009, p.3.
[15] Consolidated Amended Complaint dated March 16, 2009, p.3.
[16] Based on prices for common and preferred stock on the Bovespa.
[17] Consolidated Amended Complaint dated March 16, 2009, p.3.

*B.      An Explanation of ADRs*

14.      ADRs are negotiable securities traded in the US that represent ownership interests in publicly traded non-US companies.[18]  Although ADRs usually are linked to publicly traded equity, they also can be linked to debt securities or preferred stock.[19]  Each ADR represents ownership of a certain number (or fraction) of underlying shares of the non-US company.  For example, when first listed on the NYSE in 2001, each Sadia ADR was linked to 30 shares of Sadia's preferred stock.[20]  This ratio was changed over time to make the ADRs more liquid.  In January of 2005, the ratio was changed to 10 shares of Sadia preferred stock for each ADR[21] and in February 2008 the ratio was changed to 3 shares of Sadia preferred stock for each ADR.[22]

15.      ADRs are issued by depository institutions at the request of a broker that purchases the securities of the non-US company in the company's home market and deposits the securities with the depository institution.[23]  Once issued, ADRs trade like any other security, either on an exchange or in an over-the-counter ("OTC") market.[24]  One of the primary advantages of ADRs is that it allows US investors to diversify their portfolios by investing in non-US companies without the challenges of dealing with cross-border and cross-currency transactions.[25]

16.      ADRs can be either unsponsored or sponsored.  Unsponsored ADRs trade in the OTC market and are issued by depository banks without the involvement the company whose

---

[18] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[19] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[20] http://www.adrbnymellon.com/files/AC5655.pdf.
[21] http://www.adrbnymellon.com/files/AC5655.pdf.
[22] http://www.adrbnymellon.com/files/AD21803.pdf.
[23] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[24] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[25] http://www.depositary-receipts.com/what_are.html.

stock underlies the ADRs, and often without the permission of the company.[26]    Multiple

depository banks can issue unsponsored ADRs for the same company.[27]    Sponsored ADRs

require the involvement of the company and can be issued in three levels.    Level I ADRs are the

lowest level of sponsored ADRs and trade on OTC markets.[28]    They do not require full SEC

registration and disclosure and do not require that the company issue financial statements

prepared in accordance with Generally Accepted Accounting Standards ("US GAAP").[29]    Due to

the minimal requirements associated with this type of ADR, a majority of sponsored ADRs are

issued as Level I ADRs.[30]    Level II ADRs are traded on exchanges such as the NYSE and require

the sponsoring company to file a registration statement with the SEC and to be subject to SEC

regulation.[31]    The company must file an annual report prepared in accordance with US GAAP

and audited using US Generally Accepted Auditing Standards ("US GAAS").[32]    Additionally,

the company is required to file with the SEC any additional information available in its domestic

market.[33] Level III ADRs are the highest form of sponsored ADRs and are issued when a

company is raising capital in conjunction with its ADR filing.    Since capital is being raised,

Level III ADRs generate the most interest with US investors and companies usually provide the

most informative disclosures.    Like Level II ADRs, Level III ADRs are traded on exchanges.[34]

---

[26] http://www.investorwords.com/5182/unsponsored_ADR.html;
http://www.irwebreport.com/daily/2008/10/28/hundreds-of-non-us-companies-targeted-for-unsponsored-adrs/.
[27] http://www.irwebreport.com/daily/2008/10/28/hundreds-of-non-us-companies-targeted-for-unsponsored-adrs/.
[28] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[29] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[30] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[31] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp.
[32] http://www.sec.gov/pdf/ininvest.pdf.
[33] http://www.sec.gov/pdf/ininvest.pdf.
[34] http://www.sec.gov/pdf/ininvest.pdf.

In addition to following the reporting requirements for Level II ADRs, companies that issue Level III ADRs also must file an Offering Prospectus (Form F-1).[35]

17.    Ownership of an ADR gives the holder the right to exchange the ADR for the underlying securities.[36]  Therefore, if the market in which a company's ADRs trade is semi-strong form efficient,[37] then the price of the ADR and the returns from investing in the ADR should be closely related to the price of the underlying security and the returns from investing in the underlying security, adjusted for the foreign exchange rate and the ADR ratio.[38]  I have verified that any differences in the returns on Sadia's ADRs and the returns on Sadia's preferred stock traded on Bovespa are statistically insignificant.  In order to test this hypothesis, I regressed the returns on Sadia's ADRs (based on trading on the NYSE) on exchange rate-adjusted returns on Sadia's preferred stock (based on trading on Bovespa).  I then tested the null hypothesis that the coefficient of exchange rate-adjusted returns on Bovespa is 1 – this null hypothesis asserts that the only difference between the ADR and preferred stock returns is random noise.  The standard t-test was unable to reject the null hypothesis at the 1%, 5%, or even 10% level of significance.  Also, the $R^2$ of this regression was relatively high (0.7), implying that the level of random noise referred to earlier is low.  I conclude, therefore, that there is no statistically significant discrepancy between returns on Sadia's ADRs (traded on NYSE) and exchange rate-adjusted returns on Sadia's preferred stock (traded on Bovespa).[39]

---

[35] http://www.friedlandcapital.com/PDFs/Friedland%20Capital%27s%20Guide%20To%20American%20Depositary%20Receipts.pdf.

[36] http://www.sec.gov/pdf/ininvest.pdf.

[37] Semi-strong form efficiency is defined in Section II.C below.

[38] http://www.sec.gov/pdf/ininvest.pdf.

[39] Exhibit III provides additional details of this analysis.

C.    *The Efficient Market Hypothesis*

18.    In this section, I review the finance concept of an efficient market and discuss the connection between market efficiency, as that term is used by finance researchers, and the legal theory of "fraud on the market."

19.    The efficient market hypothesis ("EMH") often is summarized as the claim that prices in financial markets reflect available information quickly and fully. More formally, finance researchers distinguish among three forms of the efficient market hypothesis: The weak form ("WF") of the EMH is the claim that past price movements (but not necessarily other information) are quickly and fully reflected in securities prices. This means, for example, that neither past price movements nor past returns (computed from those price movements) can be used to predict future price movements or returns.[40]   The semi-strong form ("SSF") of the EMH hypothesizes that all publicly available information is quickly and fully reflected in securities prices.    This means that publicly available information – earnings announcements, announcements of new business contracts, announcements of acquisitions, etc. – cannot be used to predict future price movements or returns. Finally, the strong form ("SF") of the EMH is the claim that all available information, whether publicly available or privately held, is quickly and fully reflected in securities prices. For strong form efficiency, even "inside" information must be reflected in securities prices.

20.    All of the forms of market efficiency just discussed relate to the extent to which, and the speed with which, certain kinds of information become incorporated into securities prices. For this reason, these concepts of efficiency typically are referred to as "informational" efficiency.    In my experience, finance scholars almost always define efficiency in terms of

---

[40] For all forms of efficiency, the definition sometimes is refined to take transaction costs and other "frictions" into account. For example, WF efficiency may be defined as the hypothesis that past prices and returns cannot be used to predict future price movements and returns in a way that can be exploited profitability net of trading costs.

informational efficiency.  Indeed, a vast academic literature has been produced over the past several decades dealing with virtually every aspect of informational efficiency, and examining the informational efficiency of many different kinds of markets.

21.    In my opinion, from a finance point of view, establishing the semi-strong form informational efficiency of a market provides a sound analytical foundation for reliance on the "fraud on the market" doctrine.  This is because, in a SSF efficient market, false and misleading information, such as that at issue in this case, is reflected in securities prices quickly and fully. Consequently, investors who, relying on the integrity of the market, purchase securities issued by a company whose financial condition and outlook have been distorted favorably by material false and misleading statements, pay too much for the shares they purchase.

22.    The standard and most common method of assessing SSF efficiency is an "event study".  This method of analysis examines the relationship between a security's prices (or returns) and the arrival of new information about the entity that issued the security.  Thus, if a market is SSF efficient, when new material information about a company becomes public, the prices of the company's securities should respond positively if the news is favorable for the company and negatively in response to adverse news.  An event study uses statistical procedures to assess whether a security's price movements (or returns) over time exhibit statistically significant responses to announcements likely to contain new information about a company's financial condition and prospects.

23.    While event studies provide a direct measure of the informational efficiency of a given market, other indicators may provide indirect or circumstantial evidence as to whether a particular market is likely to be informationally efficient.  This is because informational efficiency – of whatever form – results from the underlying characteristics and structure of the

marketplace – e.g., whether the market is open to many buyers and sellers; whether there are channels through which relevant news is disseminated quickly to a broad spectrum of investors; whether investors can place orders to buy or sell quickly and can execute trades quickly at relatively low cost; and so forth. Consequently, an examination of the characteristics and structure of a given market can provide useful, if indirect, evidence of the degree to which a given market is informationally efficient.

24.    This has led analysts to consider not only the results of direct assessments of efficiency through event studies, but also to consider whether conditions in a given market are conducive to informational efficiency.

### III.    BASIS OF OPINIONS

25.    The seminal legal opinion on determining market efficiency, in *Cammer v. Bloom*, identified five factors that would support a finding of market efficiency. These factors are:

- High average weekly trading volume during the class period;

- A significant number of securities analysts following and reporting on the company's stock;

- Numerous market makers and arbitrageurs;

- Eligibility to file an S-3 Registration Statement ("Form S-3"); and

- Empirical evidence of unexpected corporate events causing an immediate response in the stock price.[41]

I discuss each of these *Cammer* factors in detail below.

---

[41] *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J 1989).

*A.      Trading Volume*

26.      Among the structural factors that may be indicative of informational efficiency is the volume of trading in a particular security.  The *Cammer* decision states that "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."[42]  Per *Cammer*, a large volume of weekly stock trades implies an efficient market in that many investors used corporate information as the basis for executing trades.[43]   During the Class Period, the average weekly turnover for Sadia's ADRs as a percentage of trading volume was approximately two percent.[44]

27.      Additionally, Sadia's preferred stock, to which Sadia's ADRs are linked, is considered to be one of the most liquid stocks traded on Bovespa.  Since September 2005, Sadia's preferred stock has been included in the calculation of the Bovespa Index ("Ibovespa").[45] Ibovespa is the main indicator of the Brazilian stock market's average performance,[46] similar to the Dow Jones Industrial Average index in the United States.  As of November 11, 2009, there were 63 stocks, including Sadia's, that were part of the notional portfolio used to calculate the Ibovespa index.[47]   The stocks that are part of this portfolio "represent more than 80% of the number of trades and the financial value registered on Bovespa's cash market" and "are responsible, in average, for approximately 70% of the sum of all Bovespa's companies' capitalization."[48]

---

[42] *Cammer,* page 1286.
[43] *Cammer,* page 1286.
[44] Exhibit IV provides additional details of this analysis.
[45] Sadia S.A. Form 20-F/A for the year ended December 31, 2008, p. 120.
[46] http://www.bovespa.com.br/indexi.asp.
[47] http://www.bovespa.com.br/indexi.asp, visited November 11, 2009.
[48] http://www.bovespa.com.br/indexi.asp, visited November 11, 2009.

28.     Sadia also is included in the Brazil Index 50 ("IBrX-50"), an index that "measures the total return on a theoretical portfolio composed by 50 stocks selected among Bovespa's most actively traded securities in terms of liquidity, weighted according to the outstanding shares' market value."[49]

29.     The volume of trading in Sadia's ADRs and the inclusion of Sadia's preferred stock, to which its ADRs are tied, in major indices support a finding that the market for Sadia's ADRs was SSF efficient during the Class Period.

    B.      Security Analysts

30.     The *Cammer* decision states that "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period."[50]   This is because, the decision explains, the existence of multiple analysts implies that company reports are closely reviewed and interpreted by investment analysts, who would make recommendations to investors based on independent analyses of the information contained in such reports and other publicly available information.  Since Sadia's preferred stock traded on Bovespa, the Brazilian Stock Exchange, as well as the Spanish Market for Latin-American Stocks in Euros ("Latibex"), a number of analysts followed the performance of its shares, as well as its ADRs.[51]  According to Thomson Reuters, at least twenty different securities analysts issued reports or commentary on Sadia securities (stock and ADRs) during the Class Period, indicating close review of Sadia financial reports by investment professionals.

31.     The large number of security analysts following Sadia supports a finding that the market for Sadia's ADRs was SSF efficient during the Class Period.

---

[49] http://www.bovespa.com.br/indexi.asp, visited November 11, 2009.
[50] *Cammer,* page 1286.
[51] Sadia's common stock also traded on the Bovespa.

*C.      Market Makers and Arbitrageurs*

32.      The *Cammer* decision observes that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[52]    Sadia's ADRs traded on the NYSE, the largest stock exchange in the world, and not in the over-the-counter market.  Under the NYSE system, trading in Sadia ADRs was managed by a specialist firm, rather than by over-the-counter market makers.  Under NYSE rules, specialists have a higher duty to maintain an orderly market in a stock than do market makers.

33.      One indicator of arbitrage activity in a stock is the level of short interest outstanding.  During the Class Period short interest represented approximately 3.96% of the Sadia ADRs outstanding.[53]

34.      That Sadia's ADRs were traded on the NYSE, with trading managed by a specialist, and the level of short interest outstanding in Sadia's ADRs support a finding that the market for Sadia's ADRs was SSF efficient during the Class Period.

*D.      Eligibility to File Form S-3*

35.      The *Cammer* decision states that "the existence of Form S-3 status is an important factor weighing in favor of finding that a market is efficient…"[54]  Foreign registrants, other than foreign governments, are eligible to file Form S-3 if:

   a.   they meet all eligibility requirements to file Form 3, except the provisions relating to being organized under the laws of the United States or any State or Territory or the District of Columbia and having their principal business operations in the United States or its territories; and

---

[52] *Cammer,* page 1287.
[53] Short interest for securities on the NYSE is reported on a bi-weekly basis. 3.96% is the average of the reported bi-weekly short interest on Sadia ADRs from 4/30/2008 through 9/15/2008.  Source: Bloomberg.
[54] *Cammer,* page 1285

b.  they file the same reports with the Commission under Section 13(a) or 15(d) of the Exchange Act as a domestic registrant.[55]

36.    Although, Sadia did not use Form S-3 in connection with a security offering during the study period, Sadia has met the eligibility requirements to file Form S-3.   Among other factors, Sadia:

a.  has securities (preferred shares, with no par value, each of which is represented with ADRs), registered pursuant to Section 12(b) of the Exchange Act that are traded on the NYSE;

b.  is considered to be a well-known seasoned issuer, as defined in Rule 405 of the Securities Act;

c.  filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and

d.  was considered a large accelerated filer as defined in Rule 12b-2 of the Exchange Act.[56]

37.    Figure 1 below shows Sadia's market capitalization based on prices quoted on the Bovespa converted to US dollars on various days between January 2, 2007 and January 2, 2009. As can be seen in Figure 1, Sadia's market capitalization grew from $2.34 billion on January 2, 2007 to $4.37 billion on April 29, 2008, the day immediately prior to the start of the Class Period.  On September 26, 2008, the day after Sadia's disclosure of the irregularities and losses at issue here, Sadia's market capitalization dropped to $2.43 billion.

38.    The ability of Sadia to file a Form S-3, combined with its market capitalization, support a finding that the market for Sadia's ADRs was SSF efficient during the Class Period.

---

[55] http://www.sec.gov/about/forms/forms-3.pdf.
[56] Sadia Forms 20-F for the years ended December 31, 2007 and December 31, 2008.

FIGURE 1



### E. Empirical Evidence of Unexpected Corporate Events Causing an Immediate Response in Stock Price

39. As noted above, an event study analyzes the responsiveness of a security's price (or, equivalently, a security's returns) to announcements that contain new (i.e., unexpected) information. This form of analysis is the standard method for assessing the SSF efficiency of markets in academic research, and is widely used for this and other purposes by both academic researchers and finance practitioners.

40. An event study examines the relationship between a security's prices (or returns) and the arrival of new material information about the entity that issued the security, or about its future prospects. If the market for a company's securities is semi-strong form efficient, then

Fianance Scholars Group                                                                    Page | 17

when new material information becomes public, the prices of the company's securities should respond positively if the news is favorable for the company and negatively in response to adverse news. An event study uses statistical procedures to assess whether a security's price movements (or returns) over time exhibit statistically significant responses to announcements likely to contain new information about a company's financial condition and prospects.

41.     To assess the responsiveness of a security's price to new information, an event study identifies and measures "abnormal returns", i.e., returns greater than or less than the returns one would expect on the security, given its risk profile and given movements in the factors that systematically affect the price of the security. Stated somewhat differently, an abnormal return is a return (or that portion of return) *not* explained by the normal return-generating process for a security.

42.     The first step in identifying abnormal returns is to estimate the normal return-generating process for the security of interest; this estimated normal return-generating process then can be used to estimate the security's normal (or predicted) returns. Due to the fact that Sadia securities trade on the Bovespa in addition to the NYSE, and that Sadia's ADRs are linked to its preferred stock, I have used a "multi-factor" model of the observed returns on Sadia's ADRs to "predict" the normal daily returns on Sadia's ADRs. I estimated this model using daily data for 2007 (the "control period"). Specifically, I regressed the daily returns on Sadia's ADRs on the daily returns of the following factors (or "explanatory variables"):

- S&P 500 index – to measure the responsiveness of Sadia's ADR returns to US market returns;

- Bovespa Index ("Ibovespa") – to measure the responsiveness of Sadia's ADR returns to Brazilian market returns;

- Bloomberg Food Index – to measure the responsiveness of Sadia's ADR returns to worldwide food industry returns;

- JP Morgan US Aggregate Bond Index – to measure responsiveness of Sadia's ADR returns to US bond returns; and

-  USD/BRL exchange rate – to measure the responsiveness of Sadia's ADR returns to changes in foreign exchange rates.

43.    Figure 2 below compares the standardized price of Sadia's ADRs to the S&P 500 Index, the Foreign Exchange ("FX") Rate Adjusted Ibovespa, and the Bloomberg World Food Index.  Visually, one can see that these factors explain or account for a major portion of movements in the price Sadia's ADRs.  This is confirmed by the estimated factor coefficients and other statistical properties of my empirical model of Sadia's normal returns, which are reported in Exhibits V-A through V-C.

44.    In assessing the SSF efficiency of trading in a given market, it is important to be clear on what SSF efficiency implies and, as important, what it does not imply.  The key implication of SSF efficiency is that the price of a security will move upwards, quickly, following the arrival of unexpected, material, favorable information and downwards, quickly, following the arrival of unexpected, material, unfavorable information.[57]  SSF efficiency does not imply that every announcement, or even every "major" announcement, will be followed by a large price movement, since investors may already have anticipated and factored into their decisions the content of the announcement.  Nor does SSF efficiency mean that large price movements will occur only on days when there has been a readily identifiable "major" announcement; while financial analysts' models and estimation methods capture the major factors that influence security prices, they still allow for and incorporate (in an "error term") considerable randomness in return generation and price movements.

---

[57] In terms of returns, in a SSF efficient market, investors will earn positive abnormal returns immediately following the arrival of unexpected, material, favorable information and will earn negative  abnormal returns immediately following the arrival of unexpected, material, unfavorable information.  Immediately in this context typically is taken to mean within one to, at most, three days.

FIGURE 2



45.      In performing an event study of Sadia's ADRs, I focused on the behavior of the price of Sadia's ADRs on and around three announcement dates during the Class Period, focusing specifically on whether the price of Sadia's ADRs responded quickly and fully to the arrival of new material information about the condition of and outlook for Sadia.

46.      The following table describes the days on which a) new and material Sadia-specific information was revealed to the market and b) there was a statistically significant reaction in the market for Sadia ADRs.

TABLE 1

| Event Date | Event Description |
|---|---|
| 8/4/2008 | StockDiagnostics.com announced that it had reiterated its OPS (Operational-cash flow Per Share) Ranking of "1" for Sadia S A. Additionally, CashFlowNews.com reported that Cash Flow from Operations for Sadia S A (NYSE:SDA) for its twelve months ended June 30, 2008 was $450,896,866, a 31% increase over the year earlier. HSBC issued an analyst report in which it downgraded Sadia from Overweight to Neutral. |
| 8/29/2008 | Independent International Investment Research PLC, issued a positive report on Sadia in which they reiterated their Buy ratings for both Sadia's preferred stock and Sadia's ADRs. |
| 9/25/2008    (issued after close of trading on the NYSE) | Sadia announced that that it would take a loss of approximately BRL 760 million related to investments in currency contracts involving the USD. |

47.     On August 4, 2008, StockDiagnostics.com announced that it had reiterated its OPS (Operational-cash flow Per Share) Ranking of "1" for Sadia for the third consecutive quarter.[58] According to the StockDiagnostics website "OPS Rankings measure the long term risk associated with a company's ability to remain in business."[59] A "1" is the most positive ranking available from StockDiagnostics.com.[60] Additionally, CashFlowNews.com reported that cash flow from operations for Sadia for its twelve months ended June 30, 2008 increased 31% over the previous year to $450,896,866. CashFlowNews.com also reported that for the quarter ended June 30, 2008, cash flow from operations increased 96% over the previous quarter to $4,736,342.[61] Finally, I note that HSBC issued an analyst report on August 4, 2008, in which it

---

[58] OPS Ranking of "1" for Sadia Reiterated by StockDiagnostics.com, Market News Publishing, August 4, 2008.
[59] www.stockdiagnostics.com.
[60] http://stockdiagnostics.com/ops_rating_new.htm.
[61] Cash Flow from Operations for Sadia Increases 31%, Market News Publishing, August 4, 2008.

downgraded Sadia from Overweight to Neutral, primarily due to high grain input costs which caused cost of goods sold to increase by 31% on a year over year basis.[62] The overall market reaction to the positive news reported by StockDiagnostics.com and CashFlowNews.com outweighed the downgrade by HSBC and the price of Sadia's ADRs increased an abnormal 4.78% on August 4, 2008.

48.     On August 29, 2008, Independent International Investment Research PLC, issued a positive report on Sadia in which they reiterated their Buy ratings for both Sadia's preferred stock and Sadia's ADRs.  The report stated that the "ADR [was] expected to appreciate by 65% over the next 6-12 months."[63]  The price of Sadia's ADRs increased by an abnormal 4.23% in response to this news.

49.     On September 25, 2008, Sadia filed a Form 6-K announcing that it would take a loss of approximately R$ 760 million related to investments in currency contracts involving the USD.[64]  The next day, the news was disseminated through the Associated Press.  Investors reacted negatively to the news and the price of Sadia's ADRs dropped by an abnormal 8.74% on September 25, 2008 and an abnormal 45.85% on September 26, 2008.

50.     The price movements of Sadia's ADRs to the above announcements support a finding that the market for Sadia's ADRs was SSF efficient during the Class Period.

*F.     Artificial Inflation in the Price of Sadia's ADRs*

51.     My event study of daily movements in the price of Sadia's ADRs during the Class Period provides an estimate of the amount by which this price was artificially inflated just prior to the disclosure of the events at issue in this matter after the close of trading on September 25, 2008.  Since the disclosure on that date focused narrowly on the fraud, and was not confounded

---

[62] HSBC Report dated August 4, 2008.
[63] Independent International Investment PLC report dated August 29, 2008.
[64] Sadia S.A Form 6-K filed on September 25, 2008.

Fianance Scholars Group                                                                                    Page | 22

by other announcements, all of the unexpected price decline in the price of Sadia's ADRs on September 26, 2008, reasonably can be attributed to the disclosure. My event study identifies a statistically significant "unpredicted" decline in the price of Sadia's ADRs of $5.62 on September 26, 2008, i.e., a price decline that is not explained by the factors that systematically affect Sadia's ADR price. This implies that, as of September 25, 2008, $5.62 of the price of Sadia's ADRs represented artificial inflation in that price.

52.    For purposes of determining the damages suffered by any individual class member it is useful, but not fully sufficient, to identify the amount of artificial inflation in Sadia's ADR price just prior to the disclosure date. One also must identify (i) the amount of artificial inflation in Sadia's ADR price on the date when the class member purchased his or her ADRs and (ii) for class members who sold before the end of the Class Period, the amount of artificial inflation in Sadia's ADR price on the date when he or she sold his or her ADRs. Therefore, to provide the information needed to compute damages for individual class members in a matter such as this, financial economists construct a "true price line", i.e., an estimate of what the price of the security of interest would have been, for each day of the Class Period, had investors not been misled.

53.    A common and generally accepted method of estimating a true price line is a process known as "backcasting". Using this method, an analyst starts with the "clean" price following the (full) disclosure of the wrongdoing and works backwards through the Class Period, determining the series of prices that would have generated the same daily returns as the actual price line (excluding days when the return was affected by the fraud or disclosure of the fraud). I present the results of backcasting the price of Sadia's ADRs graphically in Figure 3 below.

FIGURE 3



54.     The difference between the actual price of Sadia's ADRs and their estimated true price at the beginning of the Class Period (April 30, 2008), based on backcasting, is $7.21.  The difference between these two prices (i.e., actual price v. estimate true price) stayed relatively constant throughout the Class Period with an average of $7.43.  The largest difference was $8.99 and the smallest difference was $5.55 (excluding September 26, 2008, the last day of the Class Period that was used as the "clean" price).

55.     Using backcasting to estimate a true price line implicitly assumes that the wrongdoing *and its impact* were relatively constant throughout the Class Period.  In most securities cases, such an assumption may be appropriate, at least as an approximation.  In this

case, it appears that the wrongdoing itself – namely, a breakdown of financial controls and a significant departure from policies regarding hedging – started in January 2008, or earlier, and continued throughout the Class Period.[65]  Also, according to Confidential Witness 1, cited in the Complaint, after March 2008, weekly meetings that were previously attended by as many as thirty employees were restricted to a small group of Directors and executive-level officers.   To the extent that significant departures from hedging policies and the breakdown of controls began at Sadia in January (or March) of 2008, this implies that the wrongdoing at issue in this case commenced before and continued through the Class Period.  This tends to support the use of backcasting to compute the true price line in this case.

56.     However, the financial impact of the wrongdoing in this case, almost certainly varied over the course of the Class Period, because the exchange rate between the BRL and USD varied considerably over the Class Period.  It is my understanding that the speculative positions (improperly) taken by the Defendants was to short the USD.  This meant that Sadia's allegedly improper positions benefited Sadia financially when the BRL appreciated versus the USD.  Conversely, Sadia's allegedly improper positions hurt Sadia financially when the BRL depreciated versus the USD.  Figure 4 below shows the movements of the BRL relative to the USD during the Class Period.

---

[65] Data on "margin" required to support Sadia's foreign exchange positions indicates a significant ramping up in these positions in January of 2008.  See BDO Trevisan Auditores Independentes Report dated February 12, 2009.

FIGURE 4



57.    As can be seen from Figure 4, the BRL strengthened against the USD up until August 4, 2008, and then weakened sharply in the final two months of the Class Period.  Given a consistent short aggregate position against the dollar, these movements in the BRL/USD foreign exchange rate suggest that Sadia's undisclosed speculation may well have *benefitted* the firm financially during the first three months of the Class Period.  But any gains quickly turned to major losses as the BRL reversed course and weakened against the USD, with losses cumulating to $410 million at the end of the Class Period.

58.    Since the *financial impact* of the wrongdoing in this case – as distinct from the wrongdoing itself – likely varied considerably across the course of the Class Period, it is

Fianance Scholars Group                                                                                          Page | 26

appropriate, in my opinion, to make an adjustment to the backcasting procedure described above. Specifically, for purposes of constructing the true price line for Sadia's ADRs, I pose this hypothetical question:  What would Sadia's disclosure have been, and how would investors have reacted differently, had the disclosure occurred not on September 25, 2008, but on an earlier date in the Class Period?  To answer this question, I distinguish between two distinct elements of the fraud announcement and treat them separately and differently.  The first element is the departure from policy and the breakdown of controls at Sadia; the second is the financial impact – i.e., the actual dollar loss – as of the (hypothetical) disclosure date.  Regarding the first element, the facts available at this time suggest that any disclosure earlier in the Class Period would have been substantively the same as the actual disclosure after the close of trading on September 25, 2008. That is, if the wrongdoing had been disclosed earlier, Sadia still would have disclosed that its "Finance Office (*Diretoria Financeira*) implemented certain transactions in the financial market, which...were related to the variation of U.S. Dollar against Real (Brazilian currency) in amounts above the purpose of protecting the activities of the Company exposed to exchange variation."[66] Regarding the second element, the facts available at this time suggest that any disclosure earlier in the Class Period likely would have been materially *different* from the disclosure after the close of trading on September 25, 2008.  Earlier in the Class Period, Sadia likely would have announced smaller losses attributable to its improper speculation.  Indeed, during some portion of the Class Period, Sadia might well have announced that its improper speculation had resulted in a financial gain.

59.    It is possible to separate out the effects of these two components on the disclosure date.  To do this, suppose that the facts were somewhat different from the actual facts.  Suppose that Sadia had placed an undisclosed one-time bet on the outcome of a coin flip, and had lost

---

[66] Sadia S.A. Form 6-K filed on September 25, 2008.

$410 million as a result. Suppose further that investors, upon disclosure of this unfortunate outcome, fully understood and believed that this bet was a one-time aberration that would never occur again and had no implications whatsoever for the future earning capacity of Sadia or about the quality of Sadia's management, or about the strength of the Company's internal controls. Under these circumstances, investors likely would have reduced the market capitalization of Sadia by an amount closely approximating the actual loss – $410 million.

60.    In fact, the market value of Sadia's equity, including both common stock and preferred stock, declined by approximately $1.05 billion on September 26, 2008.[67] This implies that investors devalued Sadia because of the wrongdoing here, above and beyond the actual loss incurred, by approximately $640 million.

61.    Under these circumstances, in constructing a true price line, it is appropriate to treat the two elements of investors' repricing of Sadia's ADRs on September 26, 2008, somewhat differently. First, I treat that portion of the price drop that relates to a reassessment of Sadia's management and controls as a fixed reduction in the value of Sadia's ADRs. That is, investors would have responded to this element of the fraud announcement in the same way, no matter when during the Class Period the announcement had been made. I refer to this element of inflation as management and control inflation. I treat the second element, which I refer to as FX inflation, as a variable component, the amount of which depends on the BRL/USD exchange rate. The data currently available to me is not sufficient to allow me to reconstruct Sadia's improper positions and track their profitability on a daily basis throughout the Class Period. However, I have been able to estimate the amount of FX inflation by assuming that Sadia's position remained relatively constant throughout the Class Period and that the $410 million loss

---

[67] This calculation is based on changes in the prices for Sadia's common and preferred stock on the Bovespa.

occurred in the third quarter of 2008, i.e., that any earlier gains or losses from improper transactions were reported in Sadia's first and second quarter financial statements.[68]

62.     As stated above, Sadia's disclosure announcement after the close of trading on September 25, 2008, reduced Sadia's market capitalization by $1.05 billion.  Given the reported $410 million "out of pocket" financial loss on improper positions as of the disclosure date, this implies that investors' concerns about management and controls was responsible for $640 million (or 60.95%)[69] of the total change in Sadia's market capitalization.  Therefore, I estimate that of the $5.61 drop in price of Sadia's ADR's, $3.42[70] is due to the reassessment of Sadia's management and controls by investors.  This $3.42 amount is the management and control inflation in Sadia's stock price which, for reasons discussed above, persisted throughout the Class Period.

63.     The remaining $2.19[71] decline in the price of Sadia's ADRs on September 26, 2008, is attributable to the foreign exchange losses on Sadia's improper positions (i.e., represents FX inflation as of the end of the Class Period).  As discussed above, this quantum varies throughout the Class Period based on movements of the USD in relation to the BRL.  To calculate the FX inflation in Sadia's ADR price back through the Class Period, I use the USD/BRL foreign exchange rate as of June 30, 2008, the last day of Sadia's second quarter, as a base rate for calculating changes in the foreign exchange rate through the third quarter.  On June 30, 2008, the USD/BRL exchange rate was 1.6037, i.e., each US dollar was worth BRL1.6037.[72]

---

[68] I understand that there may be additional discovery in this case.  If additional information regarding Sadia's foreign exchange positions becomes available, I may be able to refine my analysis to estimate the FX inflation in Sadia's stock based on the actual transactions, and reserve the right to revise my opinions based on such information.

[69] 60.95% = 640,000,000/1,050,000,000.

[70] $3.42 = $5.62 * 60.95%.

[71] $2.19 = $5.61 - $2.42.

[72] Based on foreign exchange rate data provided by Bloomberg.

On September 25, 2008, the USD/BRL exchange rate was 1.8206,[73] a change of a positive 13.52% over the April 29, 2008 rate of 1.7044. This 13.52% change in the USD/BRL exchange rate was responsible for $2.19 of the $5.61 drop in price of Sadia's ADRs on September 26, 2008, implying that a one percent change in the USD/BRL exchange rate was associated with a change in the price of Sadia's ADRs of approximately $0.16. I use this relationship to calculate FX inflation in Sadia's ADR price; specifically, I multiply the percentage change in the USD/BRL exchange rate on each day during the Class Period by $0.16 to calculate the FX inflation in the price of Sadia's ADRs.[74]

64.    Note that on days when the USD/BRL exchange rate was lower than the USD/BRL exchange rate of 1.7044 on April 29, 2008, Sadia's currency transactions likely benefitted Sadia, and resulted in *negative FX inflation*. On such days, the negative inflation serves to partially offset the $3.42 management and control inflation. Later in the Class Period, as the USD/BRL exchange rate rose above 1.7044, FX inflation became positive, rising over time to an estimated $2.19 just prior to Sadia's disclosure announcement.

65.    Figure 5 below presents a comparison of the actual price of Sadia's ADRs and a true value line, based on the adjusted backcasting method described above.

---

[73] Based on foreign exchange rate data provided by Bloomberg.
[74] Exhibit VI provides additional details of this analysis.

FIGURE 5



66.     The true price line shown in Figure 5 (and the estimated uninflated prices for Sadia's ADRs reported in V-C, which the true price line depicts) provides a mechanism by which the damages suffered by individual class members can be assessed, given data on the date of his or her purchase, the date of his or her sale, and the number of shares purchased and sold. The mechanism is quite simple:  use the true value line to identify the amount of artificial in the price of Sadia's ADRs on the purchase date and on the sale date.  If the amount of artificial inflation is smaller (or zero) on the sale date, then multiply the number of shares purchased and sold by the reduction in artificial inflation between the purchase date and the sale date.  This amount is an estimate of the investor's loss attributable to the wrongdoing at issue in this case.

Fianance Scholars Group                                                                                  Page | 31

IV.    CONCLUSION

67.    Based on the analyses of the five factors outlined in the *Cammer* decision and on other relevant information and data, I conclude that the market for Sadia's ADRs was SSF efficient during the Class Period.  This means that all publicly available information, including material information contained in (explicitly or by omission) the alleged misrepresentations and false statements concerning Sadia's activities in foreign exchange markets, was quickly and fully incorporated into the market price of Sadia's ADRs.

68.    Based on the analyses set forth above and on the response of the price of Sadia's ADRs to the corrective disclosures discussed above, I conclude that the price of Sadia's ADRs was artificially inflated throughout the Class Period by an amount (and percentage) that varied over the course of the Class Period.  By the end of the Class Period, the artificial inflation in the price of Sadia's ADRs was approximately $5.62 per share, or approximately 37% of the pre-disclosure price of Sadia's ADRs.

*  *  *

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of December, 2009.

_____

Marc Vellrath, Ph.D., CFA