UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

IN RE SADIA, S.A. SECURITIES
LITIGATION

**OPINION AND ORDER**

**08 Civ. 9528 (SAS)**

------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

Plaintiffs Westchester Putnam Counties Heavy & Highway Laborers

Local 60 Benefit Funds ("Local 60"), Alan Hyman, Phil Carey, Steve Geist, and

Peter Schicker bring this putative securities class action based on allegations that

Sadia, S.A. ("Sadia" or "the Company") and several of its current and former

officers[1] made false and misleading statements and omissions regarding Sadia's

currency hedging practices.  On July 29, 2009, I denied Sadia's motion to dismiss

and permitted plaintiffs' claims based on the following alleged misstatements and

---

[1]      The Amended Consolidated Complaint ("ACC" or "Complaint")
names the following current and former officers of Sadia as defendants: its
chairman, Luiz Fernando Furlan; its chief executive officer, Gilberto Tomazoni; its
chief financial officer, Welson Teixeira, Jr.; its former chief financial officer,
Adriano Lima Ferreira; its former president and chairman, Walter Fontana Filho;
and its former vice chairman, Eduardo Fontana d'Avila (collectively, the
"Individual Defendants").  Because Individual Defendants have not yet been
served, plaintiffs move for class certification only as to Sadia. *See* Plaintiffs'
Memorandum of Law in Support of Motion for Class Certification ("Pl. Mem.") at
1 n.1.

omissions to proceed:  (1) Sadia's characterizations of its exposure under its

currency hedging contracts; and (2) Sadia's failure to reveal that it had entered into

currency hedging contracts in violation of its internal hedging policy.[2]  Plaintiffs

now move to certify the following class:

> [A]ll persons and entities who purchased or otherwise
> acquired [Sadia] American Depositary Receipts ("ADRs")
> from April 30, 2008 to September 26, 2008 [(the "Class
> Period")], inclusive, and who were damaged thereby (the
> "Class").[3]

Plaintiffs also seek an order appointing them as Class representatives and

approving plaintiffs' selection of Saxena White P.A. ("Saxena White") and

Barroway Topaz Kessler Metlzer & Check, LLP ("Barroway Topaz") as Class

counsel.  For the reasons set forth below, plaintiffs' motion is granted.

While plaintiffs' motion presents a number of issues commonly

considered in a class certification motion – each of which is discussed below – the

key question presented in this motion is whether plaintiffs must prove that a

misstatement or omission had an impact throughout the class period in order to

demonstrate that the undisclosed information would have been material to a

reasonable investor in making a decision to invest ("transaction causation").

---

[2]     *See In re Sadia Sec. Litig.*, 643 F. Supp. 2d 521 (S.D.N.Y. 2009).

[3]     Pl. Mem. at 1.

In the typical case, where a plaintiff can demonstrate that a stock price decline followed a corrective disclosure, a court can infer that the information contained in that disclosure was material on the day the stock price declined *and* throughout the class period. The facts presented here, however, present an atypical scenario. In most securities cases, the wrongdoing and the financial impact of that wrongdoing – most often an undisclosed loss or overstatement – are the same throughout the class period. For example, on January 1, a company publicly states that its earnings for the quarter were one hundred million dollars. In fact, the company overstated its earnings by twenty million dollars. On February 1, the company discloses the truth that it had overstated its earnings and its stock price drops by one dollar. Although such evidence is not dispositive, it can be reasonably inferred that the overstatement is material.[4] Once materiality is established, courts rarely, if ever, consider the question of whether the information was material throughout the class period.

By contrast, the financial impact of the wrongdoing here may vary considerably throughout the class period. While Sadia's currency hedging

---

[4]   *See, e.g., SEC v. Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344, 354 (S.D.N.Y. 2005) (holding that the SEC had sufficiently pled materiality of an overstatement where the market's response to the company's corrective disclosure was a substantial drop in the price of the company's stock the following day).

contracts were unwound at a loss of $410 million in September 2008, they could have resulted in  a net *profit* for Sadia had they been unwound earlier in the Class Period.  Moreover, the amount of profit and loss was not constant.  Instead, it varied day-to-day from a peak potential profit of seventy million dollars to the ultimate actual loss of $410 million.

Despite the fluctuations in the financial impact of the wrongdoing, plaintiffs argue that Sadia's alleged misstatements and omissions were material throughout the class period, regardless of whether the currency hedging contracts could have been unwound for a profit.  Plaintiffs' proof on this question consists of the testimony of their Class representatives, their evidence that the price of Sadia's ADRs dropped substantially following Sadia's corrective disclosure, and their expert's opinion that more than half of the overall price decline can be attributed to what he describes as "reputational losses" as opposed to direct losses on the currency hedging contracts.[5]  Sadia counters that there is no credible evidence that the undisclosed information would have had *any* impact on the price of Sadia's ADRs had such information been disclosed at a time when the currency hedging contracts would have *made* money rather than *lost* money.  Sadia argues that the opinion of plaintiffs' expert is nothing other than mere speculation and surely

---

[5]        *See generally* Report of Marc Vellrath, Plaintiffs' expert ("Vellrath Report").

4

cannot satisfy the standard of proof by a preponderance of the evidence.

Sadia, however, misunderstands a plaintiff's burden in proving materiality. Materiality is not determined by price impact alone. Rather, materiality depends on an assessment of all the relevant circumstances in a particular case. It requires an analysis of how information would be viewed by a reasonable investor and is influenced by considerations of fairness, probability, and common sense.[6] Because plaintiffs have provided sufficient evidence to establish that the undisclosed information would have been viewed by a reasonable investor as having significantly altered the total mix of available information, they have demonstrated materiality. Accordingly, as discussed below, they are entitled to prove reliance through both the fraud on the market and the *Affiliated Ute* presumptions.

## II.   BACKGROUND

Sadia is a major Brazilian corporation whose primary business is the production and distribution of refrigerated and frozen food products to retailers throughout Latin America, the Middle East, Asia, and Europe.[7] In addition to the

---

[6]    *See Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *In re Salomon Analyst Metromedia Sec. Litig.*, 544 F.3d 474, 482-83 (2d Cir. 2008); *Ganino v. Citizens Utils., Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992).

[7]    *See* ACC ¶ 2.

Brazilian Sao Paulo Stock Exchange ("Bovespa") and the Spanish Market for Latin-American Stocks in Euros ("ATOBEX"), Sadia's stock trades as ADRs on the New York Stock Exchange.[8] As of March 12, 2008, Sadia had over 29.9 million ADRs outstanding.[9]

Like other major exporting companies, Sadia engages in currency hedging to mitigate lost profits when foreign currency paid to it on future sales contracts declines against the value of its native currency before the transactions have been completed.[10] Currency hedging is generally used as a precautionary measure, similar to an insurance policy, to enable exporting companies to reasonably predict the value that they will receive for future sales.[11]

In or around 2004, Sadia implemented a Hedging or Investment Policy in connection with its hedging activities.[12] Among other things, this policy prohibited speculative trading and sought to control the overall exposure and risk of Sadia's assets and liabilities to the fluctuations in the value of foreign currencies

---

[8]     *See id.* ¶ 16.

[9]     *See id.* ¶ 87.

[10]    *See id.* ¶ 28.

[11]    *See id.* ¶ 30.

[12]    *See id.* ¶ 27.

being used by its trading partners.[13]  On April 30, 2008, Sadia filed its Form 6-K

with the Securities and Exchange Commission.[14]  In that Form 6-K, and on other

occasions throughout the proposed Class Period, Sadia assured its investors that its

hedging strategy used currency hedging contracts as a form of mitigating exchange

rate risk only and "d[id] not use [currency hedging] contracts for trading on

speculative purposes."[15]

On May 30, 2008, Sadia entered into the first of twenty-two currency

hedging contracts.[16]  These contracts were both larger than necessary to insure the

Company's losses on future sales and in violation of the Company's internal

hedging policy.[17]  Each of these twenty-two contracts had a maturity date of at least

a year in the future.[18]  Sadia held each of these contracts throughout the Class

---

[13]     *See id.*

[14]     *See id.* ¶ 46.

[15]     *Id.* ¶ 50.  *Accord id.* ¶ 46.

[16]     *See* Expert Report of Rene M. Stulz, Sadia's expert, ("Stulz Report")
¶ 62; ACC ¶ 31.  Although plaintiffs do not allege that Sadia entered into the first
of these speculative currency hedging contracts on May 30, 2008, plaintiffs do not
appear to dispute this fact. *See, e.g.*, Surrebuttal *[sic]* Expert Report of Marc
Vellrath ("Vellrath Reply") ¶ 9 (noting, without dispute or qualification, that the
twenty-two contracts at issue are those identified by Stulz).

[17]     *See* Stulz Report ¶ 62; ACC ¶ 31.

[18]     *See* Exs. 5A & 5B to Stulz Report (listing the trade dates and last
maturity dates for each of the twenty-two contracts).  For example, the May 30,

Period and none was unwound at a loss or a profit until they were *all* unwound at a *loss* in early-to-mid September 2008.[19]

Plaintiffs contend that Sadia's currency hedging activity was, in reality, a "high risk bet" that carried the Company to the brink of financial ruin when the Brazilian real ("BRL") depreciated in value against the United States dollar ("USD").[20]  The costs of Sadia's gamble were realized in September 2008, when the BRL plunged more than twenty percent against the USD.[21]  After the close of trading on September 25, 2008, Sadia announced that it had liquidated various currency hedging contracts, resulting in a loss of approximately BRL $760 million (USD $410 million) (the "September 25 Disclosure").[22]  On September 26, 2008, Sadia's ADR price plunged $5.62, or nearly thirty-seven percent, to close at USD $9.50 on heavy trading of over five million shares.[23]  On September 26, Sadia announced that it had fired defendant Adriano Lima Ferreira as its Chief Financial

---

2008 contract was set to mature on June 30, 2009. *See* Ex. A to Stulz Report.

[19]    *See* Exs. 5A & 5B to Stulz Report.

[20]    ACC ¶ 28.

[21]    *See id.* ¶¶ 31-33.

[22]    *See id.* ¶ 58.

[23]    *See* Vellrath Report ¶ 51.  Plaintiffs assert that Sadia's ADR price plunged $5.77.  *See* ACC ¶ 60.  Plaintiffs do not provide an explanation for this discrepancy.

Officer, replacing him with defendant Welson Teixeira.[24] The following business day, Sadia's ADRs dropped another $1.51 per share, or nearly sixteen percent, to close at $7.99.[25] Less than two weeks later, on October 6, 2008, Sadia accepted the resignations of defendants Walter Fontana Filho and Eduardo Fontana d'Avila.[26]

## III. APPLICABLE LAW

### A. Class Certification

#### 1. Requirements Under Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure governs class certification. "'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'"[27] To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy.[28]

The numerosity requirement mandates that the class be "so numerous

---

[24]    *See* ACC ¶ 59.

[25]    *See id.* ¶ 60.

[26]    *See id.* ¶ 66.

[27]    *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting *Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989)).

[28]    *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).

that joinder of all members is impracticable."[29]  Impracticable does not mean

impossible; joinder may merely be difficult or inconvenient, rendering use of a

class action the most efficient method to resolve plaintiffs' claims.[30]  "In securities

fraud class actions relating to publicly owned and nationally listed corporations,

the numerosity requirement may be satisfied by a showing that a large number of

shares were outstanding and traded during the relevant period."[31]  Sufficient

numerosity can be presumed at a level of forty members or more.[32]

Commonality requires a showing that common issues of fact or law

affect all class members.[33]  "Commonality does not mandate that all class members

make identical claims and arguments."[34]  When "common questions do

predominate, differences among the questions raised by individual members will

---

[29]     Fed. R. Civ. P. 23(a)(1).

[30]     *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007).

[31]     *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007).

[32]     *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 *Newberg On Class Actions* § 3.05 (2d ed. 1985)).

[33]     *See* Fed. R. Civ. P. 23(a)(2).

[34]     *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (citing *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 153-54 (2d Cir. 1983)).

not defeat commonality."[35]

      "Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[36] Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where "injuries derive from a unitary course of conduct by a single system."[37] A lack of typicality may be found in cases where the named plaintiff "was not harmed by the [conduct] he alleges to have injured the class"[38] or the named

---

[35]    *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996). *Accord Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (citing *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)); 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d ed. 2008) ("To the extent that 'co-extensive' suggests that the representatives' claims must be substantially identical to those of the absent class members, it is too demanding a standard.").

[36]    *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[37]    *Marisol A.*, 126 F.3d at 377.

[38]    *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006). *Accord Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002) (finding an absence of typicality where the "named claimants had not suffered 'injur[ies] similar to the injuries suffered by the other class members'" (quoting *McClain v. South Carolina Nat'l Bank*, 105 F.3d 898, 903 (4th Cir. 1997))).

plaintiff's claim is subject to "specific factual defenses" atypical of the class.[39]

Adequacy demands that "the representative parties will fairly and adequately protect the interests of the class."[40] "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[41] "[C]lass representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"[42] However, the Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance."[43] Proposed class representatives "will be found

---

[39]    *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006).

[40]    Fed. R. Civ. P. 23(a)(4).

[41]    *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

[42]    *Id.* at 61 (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)). *Accord In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 42 (2d Cir. 2009).

[43]    *Baffa*, 222 F.3d at 61 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966)). *Accord Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 344 (S.D.N.Y. 2004) (holding that inflexible application of the adequacy requirement

inadequate due to ignorance only when they have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."[44]

Finally, the courts have added an "implied requirement of ascertainability" to the express requirements of Rule 23(a).[45]  "[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."[46]  "'An identifiable class exists if its members can be ascertained by reference to objective criteria.'"[47]

---

"runs counter to a principal objective of the class action mechanism – to facilitate recovery for those least able to pursue an individual action").

[44]     *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y. 2003) (quotation marks omitted).

[45]     *In re IPO Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006).

[46]     7A Wright, Miller, & Kane, *supra*, § 1760.  *Accord In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983)).

[47]     *In re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).  *Accord id.* at 396 ("The Court also must be able to determine the class' membership "'without having to answer numerous fact-intensive inquiries.'" (quoting *Daniels*, 198 F.R.D. at 414)).

### 2.    Rule 23(b)

In addition to showing that the proposed class satisfies the four prerequisites of Rule 23(a), plaintiffs must show that the class is "maintainable" under Rule 23(b).  A class satisfies this requirement if it fits into one of the three alternative categories delineated by Rule 23(b), subdivisions (1), (2), and (3).  In the case at bar, plaintiffs move for class certification pursuant to subdivision (b)(3).

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and the court finds that class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy."[48]  Generally, "'[t]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'"[49]  The Second Circuit has observed that

---

[48]     Fed. R. Civ. P. 23(b)(3).

[49]     *Brown v. Kelly*,--- F.3d ---, No. 07 Civ. 3356, 2010 WL 2520040, at *11 (2d Cir. June 24, 2010) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107-08 (2d Cir. 2007)) (alteration and ellipsis in original). *Accord In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) ("[P]redominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") (quotation marks omitted).

this subdivision

> encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.[50]

Under Rule 23(b)(3), a court must also determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."[51]  In determining whether the class action mechanism is the most "fair and efficient" method of resolving a case, courts must consider the following four nonexclusive factors: "(1) the interest of the class members in maintaining separate actions; (2) 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class'; (3) 'the desirability or undesirability of concentrating the litigation of the claims in the particular forum'; and (4) 'the difficulties likely to be encountered in the management of a class action.'" [52]

---

[50]     *Brown*, 2010 WL 2520040, at *11 (quotations marks omitted).

[51]     Fed. R. Civ. P. 23(b)(3).

[52]     *In re Nassau County*, 461 F.3d at 230 (quoting Fed. R. Civ. P. 23(b)(3)).

### 3.    Rule 23(g)

"[A] court that certifies a class must appoint class counsel."[53]  In

doing so, a court must consider the following: (1) "the work counsel has done in

identifying or investigating potential claims in the action;" (2) "counsel's

experience in handling class actions, other complex litigation, and the types of

claims asserted in the action;" (3) counsel's knowledge of the applicable law;" and

(4) "the resources that counsel will commit to representing the class."[54]  "The court

may also consider any other matter pertinent to counsel's ability to fairly and

adequately represent the interests of the class."[55]

### 4.    Standard of Review

Plaintiffs bear the burden of demonstrating – by a preponderance of

the evidence – that the proposed class meets the requirements for class

certification.[56]  This Court must "'assess all of the relevant evidence admitted at the

class certification stage' when determining whether to grant a Rule 23 motion."[57]

"[T]he obligation to make such determinations is not lessened by overlap between

---

[53]    Fed. R. Civ. P. 23(g)(1).

[54]    Fed. R. Civ. P. 23(g)(1)(A).

[55]    Fed. R. Civ. P. 23(g)(1)(B).

[56]    *See Teamsters*, 546 F.3d at 202.

[57]    *Id.* (quoting *In re IPO*, 471 F.3d at 42).

a Rule 23 requirement and a merits issue, even a merits issue that is identical with a

Rule 23 requirement."[58]   However, "in making such determinations, a district judge

should not assess any aspect of the merits unrelated to a Rule 23 requirement."[59]

### 5.    Expert Testimony

In *In re Visa Check/MasterMoney Antitrust Litigation*, the Second

Circuit held that "a district court may not weigh conflicting expert evidence or

engage in 'statistical dueling' of experts."[60]   The Court's role was merely to

"ensure that the basis of the expert opinion is not so flawed that it would be

inadmissible as a matter of law."[61]   However, in *In re Initial Public Offering*

*Securities Litigation*, the Second Circuit disavowed that holding, explaining

instead that "[a] district judge is to assess all of the relevant evidence admitted at

the class certification stage and determine whether each Rule 23 requirement has

been met, just as the judge would resolve a dispute about any other threshold

prerequisite for continuing a lawsuit."[62]

---

[58]    *In re IPO*, 471 F.3d at 41.

[59]    *Id.*

[60]    280 F.3d 124, 135 (2d Cir. 2001) (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999)).

[61]    *Id.*

[62]    *In re IPO*, 471 F.3d at 41.

**B.    Securities Fraud**

To state a claim for securities fraud, a plaintiff must show "both transaction causation (also known as reliance) and loss causation."[63]  Transaction causation requires a plaintiff to demonstrate that "'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[64]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[65]

**1.    Transaction Causation: Fraud on the Market Presumption**

In *Basic v. Levinson*, the Supreme Court determined that an investor may invoke a rebuttable presumption of reliance in cases of misrepresentations.[66] The Court held that an investor may avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[67]

---

[63]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

[64]    *Id.* (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005)).  *Accord In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010).

[65]    *ATSI*, 493 F.3d at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172).  *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[66]    485 U.S. at 247.

[67]    *Id.* at 227.

"Because most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[68]  As long as the "plaintiffs can show that the alleged misrepresentation was *material* and publicly transmitted into a well-developed market, then reliance will be presumed . . . ."[69]

Defendants can rebut such a presumption by demonstrating that "no price impact" resulted from the misrepresentations.[70]  "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[71]  One way to "sever the link" is to demonstrate that the alleged misrepresentations were immaterial because they did not lead to a distortion in price.[72]

A "definitive assessment" that the Rule 23(b)(3) predominance requirement is met "cannot be made without determining whether defendants can

---

[68]   *Id.* at 247.  *Accord Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[69]   *In re Salomon Analyst*, 544 F.3d at 483 (emphasis added).

[70]   *Basic*, 485 U.S. at 248-49.

[71]   *Id.*

[72]   *See id.* at 248.

successfully rebut the fraud-on-the-market presumption."[73] Thus, "a court must

permit defendants to present their rebuttal arguments before certifying a class."[74]

Noting that this determination may overlap with the merits of the case, the Second

Circuit has noted that "the district court will be 'accorded considerable discretion

to limit both discovery and the extent of the hearing on Rule 23 requirements' in

order '[t]o avoid the risk that a Rule 23 hearing will extend into a protracted mini-

trial of substantial portions of the underlying litigation . . . .'"[75]

### 2.    Transaction Causation: *Affiliated Ute* Presumption

The Supreme Court has also held that a presumption of reliance may

apply in cases in which plaintiffs have alleged that defendants failed to disclose

information.  In *Affiliated Ute Citizens of the State of Utah v. United States*, the

Court held that where a plaintiff's fraud claims are based on omissions, transaction

causation may be satisfied as long as the plaintiff shows that defendants had an

obligation to disclose the information and the information withheld is material.[76]

This presumption is not conclusive.[77]  "Once the plaintiff establishes the

---

[73]    *In re Salomon Analyst*, 544 F.3d at 485 (citations omitted).

[74]    *Id.*

[75]    *Id.* (quoting *In re IPO*, 471 F.3d at 41).

[76]    *See* 406 U.S. 128, 154 (1972).

[77]    *See DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987).

materiality of the omission . . . the burden shifts to the defendant to establish . . .

that the plaintiff did not rely on the omission in making the investment decision."[78]

To satisfy this burden, a defendant must prove "that 'even if the material facts had

been disclosed, plaintiff's decision as to the transaction would not have been

different from what it was.'"[79]

### 3.    Materiality

Demonstrating materiality under the fraud on the market and

*Affiliated Ute* presumptions presents essentially the same inquiry.  "'[T]o fulfill the

materiality requirement there must be a substantial likelihood that the disclosure of

the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available.'"[80]

> Material facts include those "which affect the probable
> future of the company and those which may affect the
> desire of investors to buy, sell, or hold the company's
> securities." They include any fact "which in reasonable and
> objective contemplation might affect the value of the

---

[78]    *Id.* at 76.

[79]    *Id.* at 78 (quoting *Rochez Bros. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)). *But see Ganino*, 228 F.3d at 162 ("[I]t is not necessary to assert that the investor would have acted differently if an accurate disclosure was made.").

[80]    *In re Salomon Analyst*, 544 F.3d at 482 (quoting *Basic*, 485 U.S. at 231-32) (quotation marks omitted). *Cf. Affiliated Ute*, 406 U.S. at 153-54 (explaining that facts are material if "a reasonable investor might have considered them important in the making of [a] decision").

corporation's stock or securities."[81]

"An omitted fact may be immaterial if the information is trivial or is so basic that any investor could be expected to know it."[82]

### 4.   Loss Causation

"[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."[83] "The zone of risk is determined by the purposes of the securities laws, *i.e.*, 'to make sure that buyers of securities get what they think they are getting.'"[84] "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural

---

[81]   *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc)).

[82]   *Id.* (citing *Basic*, 485 U.S. at 231 and *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998)).

[83]   *Lentell*, 396 F.3d at 173 (emphasis in original). *Accord In re Omnicom*, 597 F.3d at 513 (noting that the Second Circuit in *Lentell* adopted the "zone of risk" test).

[84]   *In re Omnicom*, 597 F.3d at 513 (quoting *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)).

consequence.'"[85]

 To demonstrate loss causation, a plaintiff must show "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."[86]  A plaintiff must show that it was the fraud, as opposed to "the tangle of [other] factors affecting [the] price" of the security that caused the loss.[87]

## IV. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Numerosity and Commonality

 Sadia does not dispute that plaintiffs have demonstrated numerosity and commonality.  Indeed, I find that plaintiffs have met these requirements by a preponderance of the evidence.  With regard to numerosity, Sadia's ADRs were actively traded on the NYSE, an open, well-developed and efficient market.

---

[85] *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990)) (citations omitted).  *Accord ATSI*, 493 F.3d at 107 ("[T]he plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.") (citing *Lentell*, 396 F.3d at 173).

[86] *Lentell*, 396 F.3d at 173.  *Accord In re Omnicom*, 597 F.3d at 510; *ATSI*, 493 F.3d at 107.

[87] *Dura*, 549 U.S. at 343.

Although plaintiffs have not ascertained the precise number of potential Class members, "they believe that there are thousands of potential Class members dispersed throughout the United States."[88]  Just prior to the start of the Class Period, Sadia had tens of millions of ADRs outstanding.[89]  As such, numerosity is presumed.[90]

Plaintiffs also have established the commonality requirement.  The Complaint details a course of conduct whereby Sadia made material misrepresentations and omission to the public regarding Sadia's exposure under its currency hedging contracts and that such exposure violated its internal hedging policy.  Common questions of law and fact include whether (1) statements disseminated to the investing public and Sadia's shareholders during the Class Period misrepresented and/or omitted to disclose  material facts about the business, finances, financial condition, and future prospects of Sadia; (2) the market price of Sadia's ADRs during the Class Period was artificially inflated due to defendants' material misrepresentations and omissions and failure to correct those material misrepresentations and omissions; (3) defendants participated in and pursued a

---

[88]     Pl. Mem. at 7.

[89]     *See* ACC ¶ 87.

[90]     *See Consolidated Rail Corp.*, 47 F.3d at 483.

24

common course of conduct; (4) defendants' acts violated the federal securities laws; and (5) the Class has sustained damages. Accordingly, plaintiffs have demonstrated commonality by a preponderance of the evidence.

### 2. Adequacy and Typicality

Plaintiffs have also satisfied the typicality and adequacy of representation requirements. The claims of the proposed Class representatives arise from the same event or course of misconduct as other Class members and are based on the same legal theory. In addition, there are no conflicts of interests between the proposed Class representatives and other putative Class members, and no unique defenses apply only to the proposed Class representatives. Finally, the proposed Class representatives have actively litigated this case for two years, and through their counsel, have engaged in motion practice and discovery.

Sadia contests this conclusion with regard to Hyman and Local 60 on the grounds that they lack familiarity with the claims and involvement with the Class as required under Rule 23(a)(4).[91] Sadia recites a laundry list of questions

---

[91]     *See* Defendant Sadia's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp.") at 20. Sadia also asserts that Hyman, Carey, and Schicker are subject to unique defenses because they purchased Sadia ADRs prior to September 5, 2008. As explained below, Sadia contends that transaction and loss causation cannot be demonstrated class-wide prior to this date. Because I reject this argument, *see infra* Parts IV.B.1.a &b, Sadia's position that Hyman, Carey, and Schicker are subject to unique defenses on this ground is moot.

Hyman and Local 60's corporate designee could not answer during their depositions and contends that each displays an "'alarming unfamiliarity with the suit . . . .'"[92] The Court is satisfied that, while neither Hyman nor Local 60's representative has demonstrated a deep understanding of this litigation, each has the requisite basic awareness of the facts of the case and a willingness to satisfy his obligations to absent Class members.[93] As a result, Hyman and Local 60 are adequate Class representatives.

### 3. Ascertainability

I am further convinced that the Class is ascertainable using objective criteria. The Class includes all purchasers of Sadia ADRs within a certain time period. Plaintiffs note that the putative Class members can be readily identified from Sadia's books and records, as well as the records maintained by the applicable transfer agents.[94] Plaintiffs have therefore demonstrated by a

---

[92]    Def. Opp. at 21 (quoting *Green v. Brassler*, 78 F.R.D. 130, 131 (S.D.N.Y. 1978)).

[93]    *See* Plaintiffs' Reply Memorandum in Further Support of the Motion for Class Certification at 8-10 & n.9 (and citations to the record therein); 7/9/10 Hearing Transcript ("Hr'g Tr.") at 52:25-57:23; *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008) ("It is sufficient if the class representatives are aware of the basic facts underlying the lawsuit and . . . not . . . likely to abdicate his [*sic*] obligations to fellow class members.") (alterations in original) (quotation marks omitted).

[94]    *See* Pl. Mem. at 12.

preponderance of the evidence that the Class is ascertainable.

### 4.    Rule 23(g)

I find plaintiffs' counsel to be "qualified, experienced and able to conduct the litigation."[95]  The attorneys of Saxena White and Barroway Topaz have extensive experience in securities litigations and have successfully prosecuted numerous securities fraud class actions on behalf of injured investors.[96]  They have been intimately involved in prosecuting this action from its beginning stages, including investigating the claims, filing an amended complaint, successfully defending a motion to dismiss, pursuing the current class action certification, and engaging in the lengthy process of serving the Individual Defendants located in Brazil.  Accordingly, I find that Saxena White and Barroway Topaz satisfy the requirements of Rule 23(g) and appoint them as Class Counsel.

### B.    Rule 23(b)

#### 1.    Predominance

Sadia principally challenges plaintiffs' class certification motion on

---

[95]    *Baffa*, 222 F.3d at 60 (citing *In re Drexel*, 960 F.2d at 291).

[96]    *See* Firm Resume of Saxena White, Ex. H to Declaration of Christopher S. Jones, counsel for plaintiffs ("Jones Decl."); Firm Resume of Barroway Topaz, Ex. I to Jones Decl.  The Jones Declaration was filed January 5, 2009 (Docket No. 9) and incorporated by reference by plaintiffs for purposes of their class certification motion.  *See* Pl. Mem. at 10 n.7.

the ground that plaintiffs cannot satisfy the predominance requirement.[97]

Specifically, Sadia contends that plaintiffs cannot demonstrate transaction or loss

causation on a class-wide basis.  Although I conclude that plaintiffs have not yet

provided a sufficient methodology by which damages can be determined on a

class-wide basis, I find that plaintiffs have shown that common questions

predominate.

### a.    Transaction Causation

#### (i)    Plaintiffs' Burden

For purposes of transaction causation, Sadia does not dispute that the

market for its ADRs was efficient or that the alleged misrepresentations were

publicly made.[98]  The only remaining question is whether the misrepresentations

were material.[99]  Plaintiffs bear the initial burden of demonstrating that Sadia's true

exposure under its currency hedging contracts and violations of its internal hedging

policy would have been viewed by the reasonable investor as having significantly

---

[97]      *See* Def. Opp. at 6-20.

[98]      *See id.* at 10 n.14.

[99]      The standards for materiality for purposes of the fraud on the market
and *Affiliated Ute* presumptions substantially overlap.  Sadia does not suggest that
if this Court finds that the *misstatements* were material the *omissions* would not be
material or vice versa.  As a result, I will consider materiality for purposes of both
presumptions concurrently.

altered the total mix of available information.[100]  The burden then shifts to Sadia to

show that the link between Sadia's alleged misstatements and omissions and the

price paid by plaintiffs, or their decision to purchase Sadia's ADRs, was severed.[101]

One way that Sadia can show that the link has been severed is to provide evidence

that the misstatements and omissions did not artificially inflate the price of Sadia's

ADRs.[102]

            To establish materiality, plaintiffs offer two pieces of evidence.  *First*,

plaintiffs proffer the expert report of Marc Vellrath.[103]  Vellrath conducted an event

study of the daily movements in the price of Sadia's ADRs during the Class Period

with the goal of identifying any "'abnormal returns', *i.e.*, returns greater than or

less than the returns one would expect on the security, given its risk profile and

given movements in the factors that systematically affect the price of the

-----

[100]    *See In re Salomon Analyst*, 544 F.3d at 482 (quoting *Basic*, 485 U.S. at 231-32) (quotation marks omitted).

[101]    *See Basic*, 485 U.S. at 248.

[102]    *See id.*

[103]    Vellrath is an economist and financial analyst, holding M.S. and Ph.D degrees in economics from Carnegie Mellon University, an MBA degree from the University of Washington, and a BA degree from the University of Pennsylvania. Vellrath is presently the Chairman and Chief Executive Officer of Finance Scholars Group, a consulting firm with offices in California, New York, Texas, and Illinois.  Prior to organizing the Finance Scholars group in July 2006, Vellrath held a series of positions in economics and finance.  *See* Vellrath Report ¶¶ 1-3.

security."[104]  Vellrath's event study took the form of a "multi-factor" model of the observed returns on Sadia's ADRs to "predict" the normal daily returns on Sadia's ADRs.[105]  He used daily market-wide data for 2007 (the "control period").[106] Specifically, he regressed the daily returns on Sadia's ADRs on the daily returns of the following indices (or "explanatory variables"):  S&P 500 Index, the Bovespa Index, the Bloomberg Food Index, the JP Morgan US Aggregate Bond Index, and the USD/BRL exchange rate.[107]  Each index was used to compare the responsiveness of Sadia's ADR returns to those of the market as measured by its respective index.[108]

Vellrath's event study identified a "statistically significant 'unpredicted'" decline in the price of Sadia's ADRs of $5.62 on September 26, 2008.[109]  Vellrath noted that the September 25 disclosure "focused narrowly on the

---

[104]     *Id.* ¶ 41.  *See General Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 23-24 (D.D.C. 2009) (stating that an event study is an acceptable method of determining the effect of an event on stock price).

[105]     Vellrath Report ¶ 42.

[106]     *See id.*

[107]     *See id.*

[108]     *See id.*

[109]     *Id.* ¶ 51.

fraud, and was not confounded by other announcements . . . ."[110]  He therefore

opined that the entire $5.62 decline can be attributed to the disclosure.[111]  A

significant price drop following a corrective disclosure demonstrates a substantial

likelihood that a reasonable investor viewed the information contained in that

disclosure as having altered the total mix of information available to investors.[112]

Vellrath then examined the September 25 Disclosure and opines that

the price decline must incorporate two elements: (1) the *wrongdoing* – identified

as a departure from policy and the breakdown of controls at Sadia (also referred to

as a "reputational loss," or "investors' concerns about management and controls"),

---

[110]    *Id.*

[111]    *See id.* ¶¶ 9, 31.

[112]    *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir. 2005)
(explaining that where the "efficient market hypothesis" is invoked, "'the
materiality of disclosed information may be measured post hoc by looking to the
movement, in the period immediately following disclosure, of the price of the
firm's stock.'") (quoting *Oran v. Stafford*, 226 F.3d 275,  282 (3d Cir. 2000)); *In re
Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *21
(S.D.N.Y. Feb. 1, 2005) (finding that plaintiffs had sufficiently pleaded materiality
to withstand a motion to dismiss where "[t]he materiality of the statements at issue
[was] underscored by the fact that the price of Regeneron's common stock
plummeted almost 57% the day the negative news was released"). *Cf. In re Take-
Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ("'There is no
*requirement* that stock prices fluctuate as a result of a defendant's misstatements or
omissions in order for them to be material.'") (quoting *Penthouse Int'l, Inc.*, 390 F.
Supp. 2d at 353) (emphasis added).

31

and (2) the *financial impact* – identified as the actual dollar loss on the ADRs.[113] Vellrath attempted to determine which portion of the September 26 price drop can be attributed to the wrongdoing as opposed to the financial impact. He calculated that the market value of Sadia's equity, including common and preferred stock, declined by approximately $1.05 billion on September 26.[114] Based on Sadia's announced loss of about $410 million, Vellrath opined that the $640 million difference reflects the value of the wrongdoing element.[115] Using the same percent by which the market value in Sadia's equity declined based on wrongdoing versus financial impact on September 26, Vellrath allocated 60.95%[116] of the $5.62 unpredicted price decline of Sadia's ADRs – or $3.42[117] – to the wrongdoing and the remainder – $2.19[118] – to the financial impact.[119]

---

[113]   *See* Vellrath Report ¶ 58; *see also id.* ¶ 62.

[114]   *See id.* ¶ 60.

[115]   *See id.*

[116]   60.95% = 640,000,000 ÷ 1,050,000,000. *See id.* ¶ 62 n.69.

[117]   $3.42 = $5.62 x 60.96%. *See id.* ¶ 62 n.70.

[118]   Without explanation, Vellrath reached $2.19 by subtracting $3.42 from $5.6<u>1</u>, as opposed to $5.6<u>2</u> (which would yield a remainder of $2.<u>20</u>). *See id.* ¶ 63 n.71. It is unclear whether Vellrath's use of $5.61 is a typo or intentional. Nevertheless, the outcome is the same regardless of whether the remainder is $2.19 or $2.20.

[119]   *See id.* ¶ 62.

*Second*, each class representative testified that his primary allegation

of fraud is based on Sadia's failure to disclose the amount of *risk* that Sadia

undertook as part of its currency hedging practices and that doing so violated its

internal hedging policies.[120]  This testimony, coupled with Vellrath's opinions,

indicates that Sadia's wrongdoing *and* the financial impact of such wrongdoing are

material.  Neither is trivial or so basic that any investor could be expected to know

it.[121]  I therefore conclude that a reasonable investor would view Sadia's

---

[120]     *See* Geist Deposition, Ex. 9 to Declaration of John J. Gross in Support
of Plaintiffs' Reply Memorandum in Further Support of the Motion for Class
Certification ("Gross Decl."), at 11:18-22 ("Sadia . . . basically gambled with
shareholder money in attempting to, what they claim, hedge against currency
fluctuations; actually gambled far in excess of what was needed to ensure against
that and lost."); Carey Deposition, Ex. 10 to Gross Decl., at 106:22-108:5
(explaining that he believed Sadia's fraud to be its failure to disclose "the true
exposure of what Sadia was doing . . . that they were . . . speculating on the
currency exchange rates"); *id.* at 113:7-12; Schicker Deposition, Ex. 11 to Gross
Decl., at 77:11-15 ("[T]he stock collapsed once we knew, the public knew about
the hedging or the speculation, the side business the CFO was involved in this
company to boost profit.  And once that came out, that's when the stock
collapsed."); *id.* at 100:24-102:21; *see also* Berardo Deposition, Local 60's
representative, Ex. 12 to Gross Decl., at 81:20-82:2; Hyman Deposition, Ex. 13 to
Gross Decl., at 123:10-18.

[121]     *Compare Levitin*, 159 F.3d at 702 (holding that a brokerage firm's
failure to inform customer that firm could earn money from collateral posted by
customer in short-sale transactions was not material because a reasonable investor
would know that collateral securing a short-sale transaction could produce income)
*and Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 163
(S.D.N.Y. 1986) ("[T]hat a market decline can precipitate a margin call" is a fact
"so basic that any investor could be expected to know it.") (quotation marks
omitted) *with SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *23-*25

undisclosed level of risk as having significantly altered the total mix of information made available to the public.

Plaintiffs additionally argue – as they must – that there was artificial inflation in the price of Sadia's ADRs throughout the Class Period.[122]  Sadia claims that plaintiffs must submit evidence to support this argument and that they have failed to do so.  Without such evidence, Sadia asserts that plaintiffs have not met their initial burden of demonstrating materiality.[123]

Sadia's position conflicts with well-established law.  In *In re Salomon Analyst Metromedia Litigation*, the Second Circuit reviewed a district court's decision to certify a class over defendants' objection that plaintiffs could not demonstrate the materiality of the alleged misstatements and omissions.

---

(S.D.N.Y. Jan. 27, 2009) (finding that understating net income and shifting genuine earnings from one quarter to another was not so trivial as to be immaterial even though the disclosure of this information did not move the market).

[122]    *See* Hr'g Tr. at 16:2-12.

[123]    Vellrath's initial report included a methodology to establish that the price of Sadia's ADRs was artificially inflated throughout the Class Period, not just on the day prior to the September 26 price drop.  This methodology was offered in connection with calculating damages and is discussed below. *See* Vellrath Report ¶ 52 ("*For purposes of determining the damages suffered by any individual class member . . .* [o]ne [ ] *must identify (i) the amount of artificial inflation in Sadia's ADR price on the date when the class member purchased his or her ADRs and (ii) for class members who sold before the end of the Class Period, the amount of artificial inflation in Sadia's ADR price on the date when he or she sold his or her ADRs.*") (emphasis added).

Defendants argued "that the district court erred by not placing the burden on

plaintiffs to prove that the alleged misrepresentations 'moved the market,' *i.e.*, had

a measurable effect on the stock price."[124]  The Second Circuit unequivocally

stated that defendants' position was "a misreading of *Basic*."[125]  The Second

Circuit explained that, by adopting the "total mix" standard of materiality,

the *Basic* Court "fram[ed] the question of materiality in terms of how the

information would be viewed by a reasonable investor, *rather than in terms of

actual impact on market price*."[126]  The Second Circuit emphasized that the "[fraud

on the market] presumption was not justified by scientific certainty, but by

considerations of fairness, probability, judicial economy, congressional policy, and

common sense."[127]

 The Second Circuit then reaffirmed its decision in *Litton Industries,

Inc. v. Lehman Brothers Kuhn Loeb Inc.*, noting that

> To saddle a plaintiff with proving the generally
> indeterminable fact of what would have happened but for
> the omission [or the misrepresentations that skewed the
> market value of stock] would reduce the protection against
> fraud afforded by Section 10(b). The reliance presumption

---

[124] *In re Salomon Analyst*, 544 F.3d at 482.

[125] *Id.*

[126] *Id.* (citing *Basic*, 485 U.S. at 245) (emphasis added).

[127] *Id.* at 483 (citing *Basic*, 485 U.S. at 245-46 & n.24) (emphasis added).

. . . reallocates the risks of mistaken adjudications, resolving questions of doubt in favor of the investors that section 10(b) seeks to protect." *Thus, plaintiffs do not bear the burden of showing an impact on price.*[128]

To demonstrate materiality at the class certification stage, plaintiffs need not submit evidence that misstatements and omissions artificially inflated the price of Sadia's ADRs at the time they were made or throughout the class period. Such a requirement would unfairly and unnecessarily heighten plaintiffs' burden at this stage.[129] Instead, plaintiffs need only meet the "total mix" standard adopted in *Basic* and routinely applied by courts throughout the country. For the reasons already stated, plaintiffs have done so here. Accordingly, plaintiffs have satisfied

---

[128] *Id.* (quoting *Litton Indus.*, 967 F.2d at 748) (alteration in original) (quotation marks and alteration omitted) (emphasis added). The Second Circuit in *In re Salomon Analyst* ultimately found that the district court did not abuse its discretion when ruling that plaintiffs had established materiality for purposes of the fraud on the market presumption. However, the Circuit remanded the action to the district court to permit defendants the opportunity to rebut the presumption – an opportunity the district court had not provided initially. *See id.* at 486. Although the district court did not describe precisely the evidence that plaintiffs submitted to the court to demonstrate materiality, it does not appear that plaintiffs relied on expert testimony. *See In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 223 (S.D.N.Y. 2006), *overruled on other grounds*, 544 F.3d at 486.

[129] *In re Salomon Analyst*, 544 F.3d at 482 ("'Requiring a plaintiff to show a speculative state of facts, *i.e.*, how he would have acted if material information had been disclosed, or if the misrepresentation had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.'") (quoting *Basic*, 485 U.S. at 245).

their initial burden of showing that they are entitled to the fraud on the market and *Affiliated Ute* presumptions.

### (ii)    Sadia's Burden

The burden then shifts to Sadia to demonstrate by a preponderance of the evidence that Sadia's misstatements and omissions had *no price impact*. Relying on opinions expressed by its expert, Rene Stulz,[130] and the unique facts of this case, Sadia claims that investors would not consider the undisclosed risk and Sadia's violation of its internal currency hedging policies material *unless* there was an actual substantial loss resulting from the unwinding of the currency hedging contracts.

Stulz explained that for most of the period between May 30, 2008 – the date on which Sadia entered into the first of these twenty-two contracts – and September 5, 2008, the BRL was actually increasing in value as compared to the USD.[131] Because Sadia's position in these currency hedging contracts "took the view" that the BRL would strengthen as compared to the USD, Sadia was

---

[130]    Stulz earned a Ph.D in Economics from the Massachusetts Institute of Technology ("MIT").  Stulz currently holds the Everett D. Reese Chair in Money and Banking at the Ohio State University, is the Director of the Dice Center for Research in Financial Economics at the Ohio State University and is a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts. *See* Stulz Report ¶ 1.

[131]    *See id.* ¶¶ 36-53.

"winning" its bet had the contracts actually been unwound at anytime between May 30, 2008 and September 5, 2008. According to a valuation by Stulz, "at their peak value [during the Class Period], Sadia would have made a profit of more than $70 million on the [currency hedging] contracts."[132]

However, in mid-to-late August 2008, the BRL began to weaken and dropped dramatically as compared to the USD. It was only as of September 5, 2008 that Sadia was in a position to suffer losses in connection with its hedges had they been unwound. Stulz opined that had Sadia disclosed that it had entered into these speculative currency hedging contracts at a time when Sadia would have received a net profit or broken-even – *i.e.*, prior to September 5 – Sadia's ADRs would not have declined in value.[133] Effectively, Stulz opined that as long as the improper currency hedging contracts resulted in a profit for the Company, investors would not care that Sadia had exposed them to additional risk and failed

---

[132]   *Id.* ¶ 38.

[133]   *See id.* ¶ 59; *see also* Hr'g Tr. at 29:1-35:12. Stulz also opined that (1) Sadia's allegedly speculative hedging is common among companies like Sadia and, therefore, no reasonable investor would consider the information material, *see* Stulz Report ¶¶ 16-25, and (2) at the time Sadia made alleged misstatements and omissions there was a substantially low probability that Sadia would suffer the losses it announced in the September 25 Disclosure, *see id.* ¶¶ 26-35. Although they may eventually be credited by a jury, neither of these opinions undermine the results of Vellrath's event study or the Court's conclusion that plaintiffs have satisfied their burden of demonstrating materiality.

to follow its own internal policies.  Based on Stulz's position, Sadia argues that its

alleged misstatements and omission could not have artificially inflated the price of

Sadia's ADRs prior to September 5 – and, thus, had no price impact.[134]

Sadia's argument fails for lack of evidentiary support.  It is

undisputed that Sadia has shown that had some currency hedging contracts been

unwound prior to September 5, 2008, they would have resulted in a net profit.  But

Sadia has not presented evidence supporting the next step in its logic – that because

those contracts would have resulted in a profit, the price of Sadia's ADRs would

not have declined upon disclosing that Sadia had taken on substantially more risk

than was disclosed and had violated its internal hedging policies.  Stulz's opinion

is based almost entirely on a single academic study that evaluates income-

increasing *accounting* restatements.[135]  But even Stulz recognized this article does

---

[134]     *See* Def. Opp. at 8-10; Hr'g Tr. at 42:11-22 (THE COURT: "So you would not oppose the certification of a class that was as narrow as September 5th on? . . . MR. SIEGRIED [Sadia's Counsel]: I think, your Honor, honestly, unless I could convince you that post September 5th there was a loss causation problem, I absolutely – I would have to agree with you.").

[135]     *See* Stulz Report ¶ 59 (citing Jeffrey L. Callen, Joshua Livnat, and Dan Segal, "Accounting Restatements: Are They Always Bad News for Investors?" The Journal of Investing, 57, 66 (2006) (concluding that "[t]he market seems not to penalize firms that engage in income-increasing restatements through changes in accounting methods, although the evidence reported in Exhibit 5 [to the article] for these firms indicates potential opportunistic behavior by managers [*i.e.*, fraud].  Apparently, *the negative effects of this opportunistic behavior are offset by upward revisions in future cash flow expectations* since weaknesses in the

not "directly address[] the situation that developed at Sadia . . . ."[136]  Neither he nor

Sadia submited evidence specific to *this* case or conducted an independent study

that would lend credence to their position.[137]

Moreover, in the only case uncovered by this Court that addressed

materiality where the alleged wrongdoing resulted in an undisclosed benefit to the

company, the court found the concealed information material.  In *SEC v. Stanard*,

then-district judge Gerard Lynch found, following a bench trial, that a company's

*understatement* of its net income was material even though the defendant

"point[ed] to a number of facts suggesting that the impact of these inaccurate

statements on investors was limited" and that "the market exhibited little reaction"

to the company's corrective disclosure.[138]  Relying on the testimony of investors

and industry analysts, the court reasoned that "[t]he lack of market movement in

[response to the corrective disclosure] says nothing about the materiality of

significant misstatements of earnings at the time they were made.  A significant

---

accounting system is not an issue here.") (emphasis added)).

[136]     *Id.*

[137]     *Cf. In re TOUSA, Inc.*, 422 B.R. 783, 826 (S.D. Fla. Bankr. 2009)
(discrediting Stulz's criticisms because they "are almost entirely theoretical and
there is no evidence that they actually undermine the applicability and reliability of
[the opposing expert's] calculations").

[138]     2009 WL 196023, at *22.  *Accord id.* at *23-*25.

overstatement or understatement of income . . . could be expected to affect the decision-making of reasonable investors . . . ."[139]   The same rationale applies to this case.

Common sense, the testimony of the Class Representatives, and other court decisions,[140] suggest that risk taking is material to investors.  Investors concerned with risk taking may well have sold the ADRs they held whether Sadia received a net profit *or* a net loss from its speculative currency hedging practices, thereby causing the price of Sadia's ADRs to drop.  That price drop may have been a penny per ADR, or it may have been ten dollars, but there is no support at this stage for concluding that it would have been zero.  Sadia, by relying on nothing more than Stulz's unsubstantiated hypothesis, invites this Court to engage in rampant speculation and certainly does not successfully rebut plaintiffs' proof by a preponderance of the evidence.[141]

---

[139]   *Id.* at *25. *Accord id.* at *26-*27 (citing, *inter alia*, *Basic*, 485 U.S. at 231-32, *Mayhew*, 121 F.3d at 51, and *Ganino*, 228 F.3d at 162).

[140]   *See United States v. Tarallo*, 380 F.3d 1174, 1182 (9th Cir. 2004) ("[A] reasonable investor would find the level of risk to be important in deciding whether to invest."); *Stanard*, 2009 WL 196023, at *23-*25.

[141]   If further discovery reveals that, indeed, the interests of Class members that purchased before September 5, 2008 diverge from those who purchased after that date, I am confident that there are sufficient case management tools to ensure that all members of the Class are protected.  These tools include, but are not limited to, the authority to alter or amend the class certification order

### (iii)   Conclusion

Plaintiffs have presented evidence supporting the conclusion that Sadia's misstatements and omissions were material and that they have satisfied the elements of the fraud on the market and *Affiliated Ute* presumptions. Sadia has failed to present sufficient evidence to rebut these presumptions – *i.e.*, by proving by a preponderance of the evidence that there would have been *no* impact on price as a result of the failure to disclose information. I therefore conclude that plaintiffs may invoke these presumptions for purposes of demonstrating transaction causation on a class-wide basis.

---

pursuant to Rule 23(c)(1)(c), to certify subclasses pursuant to Rule 23(c)(5), and the authority to issue orders ensuring "the fair and efficient conduct of the action" under Rule 23(d). Advisory Committee Note on Subdivision (d). *See also In re Flag Telecom*, 574 F.3d at 37; *Marisol A.*, 126 F.3d at 379. In a similar vein, further discovery might result in a finding that the Class Period should begin on May 30, 2008 (the date on which the first currency hedging contract was entered into) as opposed to April 30, 2008 (the date on which Sadia made its first misstatements and omissions). Because Sadia has not contested the proposed Class Period start date on this ground and plaintiffs have alleged that Sadia's management was violating its internal controls as early as January or March 2008, *see* ACC ¶¶ 38-42, it is premature to limit the Class Period at this stage. If the Class Period is ultimately reduced to begin on May 30, 2008, Carey and Schicker may no longer be adequate and typical class representatives because they bought their Sadia ADRs prior to, and on, May 30, 2008. *See* Carey Certificate of Proposed Lead Plaintiff, Ex. E to Jones Decl. (certifying purchase date of May 19, 2008); Schicker Certification, Ex. F to Jones Decl. (certifying purchase dates of May 20, 2008 and May 30, 2008).

### b.   Loss Causation

For purposes of demonstrating loss causation, plaintiffs again rely on Vellrath's multi-factor model event study which demonstrated a "statistically significant 'unpredicted'" decline in the price of Sadia's ADRs of $5.62 on September 26, 2008, immediately following Sadia's disclosure that (1) it had mischaracterized its exposure under its currency hedging contracts; (2) it had failed to reveal that it had entered into currency hedging contracts in violation of its internal hedging policy; and (3) that it had suffered a loss of approximately $410 million as a result. Similar to the arguments presented with regard to transaction causation, Sadia first claims that to establish loss causation on a class-wide basis "plaintiffs must offer evidence to show that [ ] a misstatement or omission artificially inflated the value of Sadia ADRs *during the class period* . . . ."[142]  As was the case with transaction causation, no controlling precedent imposes such a requirement. The Second Circuit only requires evidence that the misstatement and/or omission "concealed something from the market that, *when disclosed, negatively affected the value of the security.*"[143]

---

[142]   Def. Opp. at 17 (citing *Lentell*, 393 F.3d at 173, *Dura*, 544 U.S. at 342; *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007)) (emphasis added).

[143]   *Lentell*, 396 F.3d at 176 ("Plaintiffs do allege that Merrill's 'material misrepresentations and omissions induced a disparity between the transaction price

43

Sadia next attacks Vellrath's event study methodology. *First*, Stulz opined that Vellrath ignored Sadia's announcement during a September 26, 2008 conference call with analysts that Sadia had also suffered losses in its offshore assets of "'approximately BRL100 million, BRL120 million.'"[144]  These losses were unrelated to Sadia's speculative hedging activities.[145]   In response, Vellrath stated that he "carefully reviewed *all* the information released by Sadia on

---

and the true investment quality' of 24/7 Media and Interliant securities; 'that the market price of [the] securities was artificially inflated'; and that the securities were acquired 'at artificially inflated prices and [the plaintiffs] were damaged thereby.'  Assuming (as we must) the truth of these allegations, *they may establish transaction causation; but they do not provide the necessary causal link between Merrill's fraud and plaintiffs' losses*.") (citing *Emergent Capital*, 343 F.3d at 198) (quotation marks omitted and emphasis added)).  *Accord In re Flag Telecom*, 574 F.3d at 40 ("In *Lentell*, we described the two requirements necessary to establish loss causation: 1) the loss must be foreseeable, and 2) the loss must have been caused by the materialization of the concealed risk."); *see also Dura*, 544 U.S. at 342-346 (rejecting the view that an inflated purchase price is sufficient to plead loss causation on 10(b) claims, recognizing that while "an initially inflated purchase price *might* mean a later loss . . . that is far from inevitably so" as "that lower price *may* reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price") (citation omitted and emphasis added); *Lattanzio*, 476 F.3d at 157-58 (defining loss causation as requiring that the misstatement be "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations . . . alleged by a disappointed investor" and making no mention of artificial inflation).

[144]    Stulz Report ¶ 50 (quoting Sadia September 26, 2008 conference call transcript). *Accord* Def. Opp. at 15.

[145]    *See* Stulz Report ¶ 50.

September 25 and 26, in its SEC filings and *in its conference call with analysts* [as well as] extensive coverage of the information released by Sadia's investment analysts."[146]   Vellrath opined that the announcement of losses in offshore assets was not "significant" given that it was not included in Sadia's Form 6-K Notice of Material Event.[147]   "Sadia went to great lengths to make clear that the material fact (singular, not plural) it was disclosing [on September 25 and 26] was narrowly limited to certain financial transactions and their immediate effects and that its disclosure did not extend beyond these narrow facts."[148]

*Second*, Stulz opined that Vellrath disregarded "the apparent understanding of analysts [on the September 26 conference call] that [Sadia's] dollar debt was unhedged [ ]which [along with Sadia's losses in its offshore assets] would have driven its ADR price further down below the dollar-for-dollar impact of the $410 million transaction loss for reasons entirely independent of the alleged fraud."[149]   In his response, Vellrath pointed out that "by an overwhelming margin, the focus of the analysts on the September 26 conference call and the focus of analysts' reports in the days immediately following Sadia's disclosures was on the

---

[146]   Vellrath Reply ¶ 14 (emphasis added).

[147]   *Id.*

[148]   *Id.* ¶ 16.

[149]   Def. Opp. at 15 (citing Stulz Report ¶ 50).

magnitude, nature, causes, and likely direct consequences of the foreign currency

trading losses . . . ."[150]  Sadia and the analysts' brief discussion of the unrelated

issue of the unhedged dollar debt does not prove that it affected the price of Sadia's

ADRs.[151]

   *Finally*, Sadia asserts that Vellrath "completely ignores that Sadia's

disclosure was made during one of the most troubled periods in the history of

modern capital markets."[152]  Specifically, the September 25 Disclosure occurred on

the same day that Washington Mutual was closed by the Office of Thrift

Supervision and ten days after Lehman Brothers filed for bankruptcy.[153]

   For the third time in as many months, the Court finds itself presented

with the defense: "don't blame me, blame the financial crisis."  For the same

reasons I rejected this argument in prior cases,[154] I reject it once again.  Not only is

---

[150] Vellrath Reply ¶ 17.

[151] *See id.*

[152] Stulz Report ¶ 12.  *Accord* Def. Mem. at 18-20.

[153] *See* Stulz Report ¶ 12 (citing *Financial Turmoil Timeline*, New York Federal Reserve Bank, *available at* www.newyorkfed.org/research/ global_economy/Crisis_Timeline.pdf).

[154] *See In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220, 2010 U.S. Dist. LEXIS 67664, at *55-*58 (S.D.N.Y. June 28, 2010); *King County, Wash. v. IKB Deutsche Indstriebank AG* Nos. 09 Civ. 8387, 09 Civ. 8822, 2010 WL 1702196, at *4-*7 (S.D.N.Y. Apr. 26, 2010).

there no indication that events related to the financial crisis intervened between the September 25 Disclosure and the price decline, but Vellrath controlled for that possibility by including domestic and foreign stock and bond indexes as variables in his event study.[155] Nothing in Stulz's report undermines Vellrath's event study or his opinions. I conclude that plaintiffs have demonstrated by a preponderance of the evidence that loss causation can be proven class-wide.

As Sadia notes, because plaintiffs have not alleged that any part of the September 25 Disclosure had leaked into the market prior to that date, any purchasers who sold their Sadia ADRs prior to the market close on September 25 cannot demonstrate loss causation.[156] The Second Circuit has made clear that a claim of loss causation is unsustainable for those who sold their shares prior to the corrective disclosure in the absence of allegations that some information had already leaked into the market.[157] Indeed, plaintiffs concede this point.[158] Therefore, any purchasers that sold their Sadia ADRs prior to the market's close on September 25, 2008 are excluded from the Class.

---

[155]    *See* Vellrath Report ¶ 42.

[156]    *See* Def. Opp. at 18.

[157]    *See In re Flag Telecom*, 574 F.3d at 40-41.

[158]    *See* Hr'g Tr. at 17:16-18:1.

####      c.      **Damages**

While plaintiffs have not yet offered a formula for calculating damages, plaintiffs claim that Vellrath set out a methodology that shows "a class member's damages can be easily calculated."[159]  To demonstrate that damages can be proven class-wide, Vellrath devised a methodology to construct a "true price line."[160]  A true price line is "an estimate of what the price of the security of interest would have been for each day of the Class Period had investors not been misled."[161]  According to Vellrath, "a common and generally accepted method of estimating a true price line is a process known as 'backcasting.'"[162]  Through the process of backcasting,

> an analyst starts with the 'clean' price following the (full) disclosure of the wrongdoing and works backwards through the Class Period, determining the series of prices that would have generated the same daily returns as the actual price line (excluding days when the return was affected by the fraud or disclosure of the fraud).[163]

---

[159]     Pl. Mem. at 18.

[160]     Vellrath Report ¶ 52.

[161]     *Id.*

[162]     *Id.* ¶ 53.  I note that Vellrath has not cited a single study or academic report to support his assertion that backcasting is indeed a common and generally accepted method of estimating a true price line.

[163]     *Id.*

By backcasting, Vellrath determined that there was a difference between the actual price for Sadia's ADRs and their estimated true price on each day of the Class Period.[164] This difference – the artificial inflation – ranged between $8.99 and $5.55 depending on the day.[165]

Vellrath then took this analysis one step further. Recognizing that Sadia's net profit or loss from the currency hedging contracts varied throughout the Class Period,[166] Vellrath opined that while the artificial inflation caused by the *financial impact* varied over the course of the Class Period, the artificial inflation caused by the *wrongdoing* (measured as a "reputational loss") would have remained constant.[167] As described above, Vellrath measured the artificial inflation in the price of Sadia's ADRs as of September 25, 2008 to be $3.42 per ADR. Vellrath then backcasted an adjusted true price line by holding the $3.42 inflation constant throughout the Class Period, while modifying the financial impact component to reflect changes in the BRL/USD exchange rate.[168] From this analysis, Vellrath opined that he can identify the amount of artificial inflation in

---

[164]   *See id.* ¶ 54.

[165]   *See id.*

[166]   *See id.* ¶ 57.

[167]   *See id.*

[168]   *See id.*

the price of Sadia's ADRs for any day during the proposed Class Period, and, thus
will be able to calculate damages on a class-wide basis.[169]  Underpinning Vellrath's
methodology is his assumption that even if Sadia had disclosed its improper
currency hedging practices between May 30, 2008 and September 5, 2008 – when
Sadia's "bets" would have resulted in a net profit – the dollar amount of Sadia's
ADRs that corresponded to the value of its wrongdoing would have declined by
precisely the same amount as it did on September 26, 2008.[170]

       Stulz challenged Vellrath's opinion that the value of the wrongdoing
would have remained constant throughout the Class Period regardless of whether
Sadia's speculative hedging would have resulted in a net profit.  In addition to
honing in on the absence of support for Vellrath's assumption that the wrongdoing
value remains constant, Stulz objects to Vellrath's assumption that all (or any) of
the amount Vellrath associates with the wrongdoing – *i.e.*, the $640 million – was
due solely to an alleged loss of confidence in Sadia's management and a penalty
for failing to comply with internal controls.[171]  Stulz opined "that large losses
increase the risk of financial distress of a firm (or even cause financial distress) and

---

[169]    *See id.*

[170]    *See id.* ¶¶ 58, 61.

[171]    *See* Stulz Report ¶¶ 43-66.

that financial distress is costly for firms."[172]  Such costs include "reductions in investment as the firm has fewer internal resources to finance investment, loss of customers as they worry about the credit risk of their counterparty, and increases in the levels of debt and its cost as the debt becomes riskier."[173]  For ease of discussion, I refer to these as "Large Loss Costs."

According to Stulz, Vellrath failed to account for the fact that Large Loss Costs and the market's reaction to them would likely vary with the size of Sadia's actual losses.  For example, Stulz posited that when Sadia disclosed its $410 million loss, market participants grew concerned about the impact of the transaction loss on Sadia's cost of debt, leverage, and ability to finance planned capital expenditures.[174]  Put another way, the market factored in the possibility that creditors would have charged Sadia higher interest rates upon the announced loss of $410 million because creditors would have been concerned about Sadia's ability to repay any loans.  Had the actual loss been zero or a net profit, Sadia's creditors

---

[172]    *Id.* ¶ 44.

[173]    *Id.*

[174]    *See* Def. Opp. at 14 (citing Stulz Report ¶¶ 11, 44 ("The magnitude of the cash loss was greater than analyst forecasts of Sadia's expected net income for 2008, the transaction loss wiped out one year's earnings for Sadia, and it represented roughly three-quarters of one year's capital expenditures and roughly 10% of Sadia's debt.")).

would have fewer concerns about Sadia's ability to pay and the price of Sadia's

ADRs might have declined less steeply.  Thus, Stulz opined that Vellrath

overstated the inflation in Sadia's ADRs prior to September 5, 2008, and failed to

provide a suitable and reliable methodology for determining this inflation.

In response, Vellrath did not argue with Stulz's opinion that Large

Loss Costs comprise a portion of the loss.  Vellrath explained that he included

these costs as part of his calculation of the wrongdoing element and reputational

losses and that they may be backcast as a constant.[175]  Vellrath submitted five

papers that purportedly support both his methodology for determining the value of

Sadia's wrongdoing (discussed in terms of reputational loss and the concern for

breakdowns in management and controls) and that the value would have remained

constant regardless of the financial impact.[176]  Because these papers were not a part

of Vellrath's initial report or listed in materials relied upon, this Court granted

Sadia's request to file a sur-reply for the sole purpose of addressing issues raised

by the new articles cited.  On sur-reply, Stulz argued that the none of the articles

submitted by Vellrath are precisely on point.

---

[175]     *See* Vellrath Reply ¶ 24 (citing Ingo Walter, "Reputational Risk and Conflicts of Interest in Banking and Finance: The Evidence So Far," *J. Fin. Transformation*, at 40 (2007), Ex. 3 to Gross Decl.).

[176]     *See id.* ¶¶ 19-28.

52

I agree.  Undoubtedly each article supports Vellrath's opinion that

losses can result from wrongdoing alone and can be measured following a

corrective disclosure – supporting his methodology for purposes of transaction and

loss causation.[177]  Moreover, at least two articles support the contention that the

"loss of an institution's franchise value can far outweigh an accounting loss when

its reputation is called into question."[178]  However, none of the articles supports

Vellrath's opinion that the wrongdoing value can be reliably backcast *as a*

---

[177]    *See, e.g.*, Walter, *supra* n.175, at 40 ("[A] reputation-sensitive event
might occur that triggers an identifiable monetary decline in the market value of
the firm.  After subtracting from this market capitalization loss the present value of
direct and allocated costs, such as fines, penalties, and settlements under civil
litigation, the balance can be ascribed to the impact on the firm's reputation."); *id.*
at 44 (endorsing the use of an event study to determine reputational risk "where the
reputational-sensitive event was 'clean' in terms of the release of the relevant
information to the market"); Giuseppina Cannas, *et al.*, "Quantifying Reputational
Effects for Publicly Traded Financial Institutions," *J. Fin. Transformation*, 77
(2009), Ex. 4 to Gross Decl. ("We can assume that a reputational effect can be
indirectly measured through the impact of a loss announcement on a firm's equity
value.").

[178]    Walter, *supra* n.175, at 46.  *Accord id.* at 54 ("Financial firms
continue to encounter serious instances of reputation loss due to misconduct
despite its effects on the value of their franchises"); Jonathan M. Karpoff *et al.*,
"The Cost to Firms of Cooking the Books," 43 *J. Fin. & Quantitative Analysis*, at
27-29 (2006), Ex. 6 to Gross Decl. (finding that reputational losses are far larger
than the cost of fines, class action settlements and accounting write-offs resulting
from the events in question).

*constant.*[179]

For example, Vellrath quoted a paper by Professor Ingo Walter, which states that "'[r]eputation risk is usually the consequence of management *processes* rather than discrete *events* . . . .'"[180]   Vellrath opined that based on this assessment "it is perfectly reasonable to conclude that the reputational inflation remained constant throughout the Class Period."[181]   Not only is this quote taken out of context,[182] it says nothing about whether that risk is constant.   Indeed, as pointed out by Stulz, "[n]othing in the Walter study suggests that the effect of factors that are directly influenced by the magnitude of the operational loss – such as the firm's

---

[179]     I also note that all except one focuses on reputational loss in the financial services or banking industry with no indication that their results are appropriately extrapolated to other industries. *See* Walter, *supra* n.175, at 40 ("Financial services . . . are special because they deal mainly with other people's money, and because problems that arise in financial intermediation can trigger serious external costs"); Cannas, *supra* n.177, at 76 ("This paper aims to measure reputational effects for *financial institutions* . . . .") (emphasis added); Costanza Consolandi, *et al.*, "US Financial Institutions:  Reputational Risk and Senior Management Sell Decisions," *Working Paper*, 1 (2009) (accepted and presented at the 2009 European Financial Management Symposium), Ex. 5 to Gross Decl.

[180]     Vellrath Reply ¶ 23 (quoting Walter, *supra* n.175, at 40) (emphasis added).

[181]     *Id.*

[182]     The full quote reads:  "Reputational risk is usually the consequence of management processes rather than discrete events, and therefore requires risk control approaches that differ materially from operational risk."  Walter, *supra* n.175, at 40.

cost of borrowing, leverage, and ability to fund capital expenditures – can be backcast as a constant . . . ."[183]  Vellrath further opined that "two recent academic papers in financial econometrics take precisely the approach of constant reputational risk in the absence of any news about relevant management processes."[184]  He then cited to two articles, a full reading of which reveals nothing resembling support for Vellrath's theory that a wrongdoing value can be backcast as a constant.[185]

I am not convinced that Vellrath has sufficiently supported his methodology that a wrongdoing value can be backcast as a constant throughout the Class Period where the value of the actual loss varies.  An investor that perceives its investment as a risk may sell its stock in response to learning that management

---

[183]     Reply Report of Professor Rene Stulz ¶ 16.

[184]     Vellrath Reply ¶ 23 (citing Cannas, *supra* n.177, at 69; Consolandi, *supra* n.179, at 7-8).  Vellrath did not originally provide page citations for either of these two articles.  At the Court's request, Vellrath submitted the indicated page citations.

[185]     *See* Cannas, *supra* n.177, at 80 (concluding that there is an "evident reputational effect due to internal fraud events" that is "revealed through a sharp negative impact on the [cumulative abnormal return] values" and that "the negative impact *progressively diminishes* after sometime") (emphasis added); Consolandi, *supra* n.179, at 2-3, 14 (considering the impact of insider trading on share prices and arguing that insider sales have reputational consequences for financial institutions, but focusing on changes *after* the insider sale and drawing no conclusions about whether the reputational impact can be backcast at a constant level).

is failing to abide by its risk management policies, regardless of whether the

company's risk taking resulted in a profit.  A creditor or lender, on the other hand,

may be more concerned about the company's *ability to make its payments* than

whether it is in compliance with its internal risk controls.  As Sadia and Stulz

argue, Vellrath's model included within its constant reputational loss figure a

figure that will *vary* based on the *size* of the loss (if any).  While this analysis does

not defeat transaction or loss causation, it does undermine plaintiffs' claim that

they can present a reliable methodology for purposes of calculating damages.

Nonetheless, this is not a bar to class certification.[186]  Because plaintiffs have

demonstrated by a preponderance of the evidence that transaction and loss

causation can be proven class-wide, the predominance requirement is met.

### 2.    Superiority

Defendants do not challenge superiority.  I also independently

conclude that a class action is superior to other available methods for the fair and

efficient adjudication of this case.  The case involves thousands of potential

claimants who are asserting claims based on predominantly common issues.

---

[186]    *See In re NYSE Specialist Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y.
2009) ("Conflicts over damages, at this early stage in the litigation, need not defeat
a motion for certification.") (citing *In re WorldCom*, 219 F.R.D. at 302 ("When
liability can be determined on a class-wide basis, individualized damage issues are
not ordinarily a bar to class certification.")).

Claimants likely have no interest in pursuing their own claims, which may be prohibitively small. Adjudicating individual claims would also be a significant waste of judicial resources. In addition, this litigation has been pending since 2008. Class counsel and Class representatives have already spent a significant amount of time litigating this case. Having already decided a motion to dismiss, this Court is familiar with the claims in this case, further making it desirable to continue this litigation here. Finally, managing this litigation as a class action will not pose any substantial difficulties for the Court.

## V.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is granted, except that purchasers who sold shares prior to the close of the market on September 25, 2008 are excluded. The Clerk of the Court is directed to close this motion (Document No. 47). A conference is scheduled for August 16, 2010 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      July 20, 2010
            New York, New York

57

## - Appearances -

### For Plaintiffs:

Curtis Victor Trinko, Esq.
Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
(212) 490-9550

Catherine A. Torell, Esq.
Cohen, Milstein, Sellers & Toll,
   P.L.L.C.
150 East 52nd Street, 30th Floor
New York, New York 10022
(212) 838-7797

Lester R. Hooker, Esq.
Maya Saxena, Esq.
Christopher Steven Jones, Esq.
Saxena White P.A.
2424 N. Federal Highway
Boca Raton, Florida 33431
(561) 394-3399

### For Defendant Sadia, S.A.:

Lawrence Steven Hirsh, Esq.
Jonathan Dick Siegfried, Esq.
John Eric Schreiber, Esq.
James P. Smith, III, Esq.
Dewey & LeBouef, LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

John J. Gross, Esq.
Christopher L. Nelson, Esq.
Katharine M. Ryan, Esq.
Barroway Topaz Kessler Meltzer &
   Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Joseph E. White, Esq.
Milberg, LLP
5200 Town Center Circle, Suite 600
Boco Raton, Florida 33486
(561) 361-5000